Jonathan Ambrose VanLoan
In Propria Persona
6110 East 2nd Street
Tucson, Arizona
520.274.5636
9thcircuitplaintiff@gmail.com



FILED ___ LODGED
RECEIVED ___ COPY

8   APR 3 0 2018   8

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

Jonathan Ambrose VanLoan,

        Plaintiff,

**CV18- 226TUC-DTF**

v.

The Nation of Islam; Louis Farrakhan;
Tony Muhammad; Mikal Omar Rasul;
The Church of Scientology International;
David Miscavige; The Church of Scientology
of Arizona; Diane Koel; Virginia Leason;
Community Bridges, Inc.;Frank Scarpati;
Deann Miller-Heyer; John F. Hogeboom;
The City of Mesa; Mesa Fire Department "Doe"
Paramedics; Mesa Fire and Medical Department;
Banner Health, Inc.; Peter S. Fine; Marjorie
Bessel, M.D.; Himada Properties LLC;
Laurel Lee Pavlik; Jagdish M. Patel;
Ramada Worldwide, Inc.; Wyndham Worldwide,
Inc.; Stephen P. Holmes; Caryl Porter; The
City of Tucson; The Tucson City Council;
Regina Romero; Paul Cunningham; Shirley
C. Scott; Karin Ulrich; Richard Fimbres; Steve

COMPLAINT
FOR DAMAGES;
CIVIL RIGHTS;
42 U.S.C. 1983
INJUNCTIVE RELIEF;
JURY TRIAL
REQUESTED

1

Kozachik; Two Hispanic Tucson Police Officer
"Doe" Defendants; Jonathan Rothschild;
Community Intervention Associates, Inc.;
"Dustin "Doe" Crisis Worker; Fred Cogburn;
SMSJ Holdings LLC; CHN Holdings LLC;
Tucson Hospital Holdings, Inc.;
Tenet Healthcare Corporation;
Dignity Health; Ascension Health, Inc.;
Ronald A. Rittenmeyer; Mark A. Benz;
Juan Fresquez; Nancy Melcher; Vera
Walker Daniel; Steven Pike, M.D.; Adrienne
P. Yarnish, M.D.; Emergency Medicine
Associates; St. Joseph's Hospital "Doe"
Defendants 1-50; Christopher Magnus;
Tucson Police Officer "Doe" Defendants
1-9; General Growth Properties, Inc.;
Cara M. Christ, M.D. (Personally); The
Islamic Center of Tucson; Mir Rehmatullah;
Hossein Hameed; Ismail K. Zahlan; Lynn C.
Hourani; Taha Hasan; Abbas Khan; Mahmood
Alabagi; Abdulla Alabagi,

Defendants.

# COMPLAINT
## JURISDICTION

1.  Subject matter jurisdiction is found in this case pursuant to 28 U.S.C.

1331. Diversity jurisdiction exists pursuant to 28 USC 1332. Supplemental

jurisdiction, where necessary, for the District Court to hear Plaintiff's related state law claims, is provided by 28 U.S.C. 1367.

## VENUE

2. Venue for this Action is proper in this District pursuant to 28 U.S.C. § 1391 (b) (2), as a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

## PARTIES

3. Plaintiff is Jonathan VanLoan, a Citizen and domiciliary of the Commonwealth of Pennsylvania, residing at 12 Westgate Circle, Malvern, Pennsylvania, 19355.

4. The Nation of Islam ("NOI") is a Black Nationalist and Islamic Organization,, with a national headquarters of Mosque Maryam, 7351 South Stony Island Avenue, Chicago, Illinois, 60649. The Nation of Islam has orchestrated a campaign of terror and attempted murder against Plaintiff since January 1, 2014, beginning in downtown Los Angeles, in four different states--California, New Mexico, Utah, and Arizona. The Nation of Islam maintains the N.O.I. Muhammad Mosque Study Group in Tucson, with an address listed of, % Minister M. Omar Rasul, P.O. Box 5282, Tucson, Arizona 85705.

5. Minister Louis Farrakhan is the titular leader of the Nation of Islam, with a primary address of Mosque Maryam, 7351 South Stony Island Avenue, Chicago, Illinois, 60649. Upon information and belief, Minister Farrakhan gave the approval to Student Minister Tony Muhammad and other Nation of Islam operatives for the Radical Islamic Terror campaign against, and attempted murder of, Plaintiff.

6. Tony Muhammad, Student Minister to Louis Farrakhan, is, upon information and belief, the West Coast Regional Representative of the Nation of Islam, with an office address, upon information and belief, at Muhammad Mosque #27, 1000-1030 West 87th Street, Los Angeles, CA 90044. Tony Muhammad has orchestrated the campaign and murder attempts against Plaintiff, upon information and belief, since December 15, 2013, in multiple states, including Arizona. Plaintiff has personally observed Tony Muhammad during the N.O.I.'s campaigns against him in El Cajon, CA, at the Villa Embasadora Motel, and in Albuquerque, NM, at the Route 66 Hostel.

7. Minister Mikal Omar Rasul is, upon information and belief, the leader of the N.O.I. Muhammad Study Group in Tucson, with an address, upon information and belief, of 1265 West Roger's Road, Apartment 5, Tucson, Arizona 85705. Upon information and belief, Mikal Omar Rasul has actively

participated in the conspiracy to murder Plaintiff in Tucson, both in May of 2017, and since Plaintiff's return to Tucson the end of March, 2018.

8. The Church of Scientology International ("COS"), is a religion, and a California non-profit corporation, with a registered entity address of 6331 Hollywood Blvd., Suite 1200, Los Angeles, CA 90028. The Church of Scientology Mission of Tucson is located at 2002 East 17th Street, Tucson, Arizona, 85719. The Church of Scientology has actively participated, upon information and belief, in the plot to murder Plaintiff, during October and November, 2016 in Phoenix, Arizona, and again in May, 2017, in Tucson, Arizona. The Church of Scientology has had a very close relationship with the Nation of Islam for years, and a number of N.O.I. Student Ministers have become Scientology "Auditors", including, upon information and belief, Tony Muhammad.

9. David Miscavige is the leader of the Church of Scientology. Upon information and belief, David Miscavige, from the very beginning of the plot to murder Plaintiff, has given material and financial support, manpower, technological and strategic support to the Nation of Islam's Radical Islamic Terror Campaign and murder attempts against Plaintiff, in multiple states, including California, New Mexico, Utah, and Arizona.

10. The Church of Scientology of Arizona is an Arizona non-profit corporation with an address of 3875 North 44th Street, Phoenix, AZ 85018.

11. Diane Koel is the President of the Church of Scientology of Arizona, with an address of 3021 East Hubbell Street, Phoenix, Arizona, 85008. Upon information and belief, Diane Koel has been aware of the Church of Scientology's participation in the plot to murder Plaintiff in Arizona, since at least November, 2016, and did nothing to stop it.

12. Virginia Leason is the Director of Special Affairs for the Church of Scientology of Arizona. Plaintiff contacted the Church of Scientology in Phoenix many times beginning in November 2016 to complain about the Church's terror activities against Plaintiff in Phoenix, Mesa, Gilbert and Chandler, Arizona, and was told that Ms. Leason would call him back, but she never did. Virginia Leason did nothing, upon information and belief to investigate Plaintiff's allegations of the C.O.S.'s conspiracy with the Nation of Islam in its attempts to murder him, and did nothing to stop the terror against Plaintiff.

13. Community Bridges, Inc. ("CBI") is an Arizona non-profit corporation, with an office address of 1855 West Baseline Avenue, #101, Mesa, Arizona. CBI is one of the primary providers of mental health services

to persons in Arizona who receive Medicaid. CBI employees and its President conspired with the Nation of Islam and the Mesa Fire Department to murder Plaintiff on November 3rd & 4th, 2016.

14. Frank Scarpati is the Chief Executive Officer of CBI, with an office address of 1855 West Baseline Avenue, #101, Mesa, Arizona 85202. Frank Scarpati, upon information and belief, was complicit in the plot to murder Plaintiff with the Nation of Islam and the Mesa Fire and Medical Department, on November 3rd and 4th, 2016, using CBI. facilities. Frank Scarpati refused to speak with Plaintiff after the attempt on Plaintiff's life involving CBI facilities and personnel, though Plaintiff called him many times at the CBI office.

15. Deann Miller-Heyer is an Officer of CBI. Plaintiff called to complain to Miller-Heyer after CBI staff members attempted to murder Plaintiff on November 3rd and 4th, 2016, but Miller - Heyer refused to speak with Plaintiff, instead taking an extended vacation away from the CBI office, so she was unavailable when Plaintiff called.

16. John F. Hogeboom is a Director of CBI, with an office address of 1855 West Baseline Avenue, #101, Mesa, Arizona 85202. Upon information and belief, John Hogeboom either knew about CBI's conspiracy with the Nation

of Islam and the Mesa Fire Department to murder Plaintiff on November 3rd and 4th, 2016, either before the fact, giving his tacit assent, or learned about it after the fact, and failed to report the crimes to federal law enforcement authorities.

17. The City of Mesa is a municipal corporation with an address of 20 E. Main Street, Mesa, Arizona 85215. The City of Mesa, as a "state actor" has supervisory responsibility for acts of its employees which violate civil rights of persons, guaranteed by the U.S. Constitution.

18. Mesa Fire and Medical Department Paramedic "Doe" Defendants are two male paramedics who transported Plaintiff from CBI to Banner Desert Medical Center, located at1400 South Dobson Road, Mesa, Arizona 85202, early on the morning of Friday, November 4th, 2016. The City of Mesa Fire Department's headquarters address is 5950 East Virginia Street, Mesa, Arizona, 85215. While transporting Plaintiff, the Paramedic "Doe" Defendants attempted to murder him, by putting an I.V. medication into his body through his arm, designed to explode Plaintiff's heart. When Plaintiff learns the identity of these Defendants, he will amend his Complaint to name them personally.

19. The Mesa Fire and Medical Department is an agency of the City of Mesa, with a headquarters address of 13 West 1st Street, Mesa, AZ 85201.

20. Banner Health, Inc. upon information and belief, is the owner of Banner Desert Medical Center, and is an Arizona non-profit corporation, with an corporate address of 2901 North Central Avenue, Phoenix, Arizona, 85012. The Nation of Islam, in conspiracy with the Tucson Fire Department Medical Services, and employees of Banner Health, Inc. working in the Emergency Room at Banner Desert Medical Center, both terrorized and attempted to murder Plaintiff early the morning of Friday, November 4th, 2016.

21. Peter S. Fine is the Chief Executive Officer of Banner Health Inc., with an office address of 2901 North Central Avenue, Phoenix, Arizona, 85012. Plaintiff called Peter Fine repeatedly after the Radical Islamic attempt on his life at Banner Desert Medical Center, but Peter Fine refused to take Plaintiff's calls and refused to investigate Plaintiff's allegations of Radical Islamic Domestic Terrorism at Banner Desert Medical Center. Peter Fine also blocked Plaintiff's email address.

22. Marjorie Bessel, M.D. is the Chief Clinical Officer of Banner Health, Inc., with an office address of 2901 N. Central Avenue Suite 160

Phoenix, AZ 85012. Dr. Bessel, upon information and belief, responsible for the quality of care administered by the Emergency Department of Banner Desert Medical Center

23. Himada Properties LLC is a California LLC, with an address of 3640 East Mandeville Place, Orange, California 92867. Himada Properties LLC owns the Ramada Limited Tucson West Motel, where the Nation of Islam, the Tucson Police, and Laurel Lee Pavlik, General Manager of the Ramada Limited Tucson West, conspired to murder and attempted to murder Plaintiff, by planting a bomb in Room # 146 at the Motel, before Plaintiff checked in, late in the evening on May 2, or early in the morning, on May 3rd, 2017.

24. Laurel Lee Pavlik was, and upon information and belief, may still be, the General Manager of the Ramada Limited Tucson West, located at 665 North Freeway, Tucson, AZ 85745. Upon information and belief, Laurel Lee Pavlik conspired with the Nation of Islam and the Tucson Police Department to murder Plaintiff, by allowing the N.O.I. to plant a bomb in Room 146, the room Plaintiff was checked into, when he arrived late on the evening of Wednesday, May 3rd, or early the morning of May 4th, 2017. When Plaintiff later complained to Laurel Lee Pavlik about allowing the

N.O.I. to plant a bomb in his room, she said, "If "they" (the Nation of Islam) were smart enough to plant a bomb in our room, they're smart enough to break into our room". Plaintiff responded, "OK, but your front desk staff put me in the room with the bomb, and the Motel was virtually empty. You had to have told them which room to put me in." Laurel Lee Pavlik had no response to this observation by Plaintiff. Laurel Lee Pavlik's address is, upon information and belief, 1292 West McMillan Street, Tucson, AZ 85705.

25. Jagdish M. Patel, is, upon information and belief, the sole Member of Himada Properties LLC, with an address of 3640 East Mandeville Place, Orange, California 92867. When Plaintiff attempted to call Jagdish Patel after the bomb murder attempt, to complain that the Manager of the Ramada Limited Tucson West (Laurel Pavlik) would allow the attempted murder of a Motel guest, Jagdish Patel, through his agent Laurel Pavlik said, in essence, "sue me".

26. Ramada Worldwide, Inc., is a Delaware Corporation doing business in Arizona, with a Registered Agent in Arizona as Corporate Creations Network, 3260 North Hayden Road, #210, Scottsdale, AZ 85251. Ramada Worldwide, Inc. is the franchisor or licensor of the "Ramada"

brand to the Ramada Limited Tucson West. When, after his attempted murder at the Ramada Limited Tucson West, Plaintiff contacted Marc Merriweather, Group Vice President of Litigation for Wyndham Worldwide, Inc., the owner of Ramada Worldwide, Inc., to complain about his attempted murder at a "Ramada" property, Marc gave Plaintiff the Himada Properties LLC name as the owner of The Ramada Limited Tucson West, but said in essence, "if you sue us, we won't give you a penny".

27. Wyndham Worldwide, Inc., a Delaware Corporation, is the owner of Ramada Worldwide, Inc. Wyndham has a subsidiary entity registered in Arizona called Wyndham Worldwide Operations, Inc, with a foreign address of 22 Sylvan Way, Parsippany, New Jersey 07054.

28. Stephen P. Holmes is the Chairman and Chief Executive Officer of Wyndham Worldwide, Inc. and the President of Wyndham Worldwide Operations, Inc., with a corporate business address of 22 Sylvan Way, Parsippany, New Jersey 07054. Plaintiff has been emailing Stephen P. Holmes for the last 11 months about his near death experience at the Ramada Limited Tucson West, without response.

29. Caryl Porter is the Vice President of Operations for Ramada Worldwide, Inc., with a corporate office address of 22 Sylvan Way,

Parsippany, New Jersey, 07054. Caryl Porter has refused to communicate with Plaintiff regarding his attempted assassination at the Ramada Limited Tucson West Motel.

30. The City of Tucson is a municipal corporation, with an address of City Hall--255 West Alameda, Tucson, Arizona 85701.

31. The Tucson City Council is the local policy making and law-making body, possessing broad authority and the legal power to govern the affairs of the City of Tucson, with an address of City Hall, 255 West Alameda, Tucson, Arizona  85701. The individual Tucson City Council Members during May, 2017, when Tucson Police Department and Tucson Fire Department employees attempted to murder Plaintiff in the course of their official duties, were Regina Romero, Paul Cunningham, Shirley C. Scott, Karin Uhlich, Richard Fimbres, and Steve Kozachik, with an address of City Hall, 255 West Alameda, Tucson, Arizona  85701. The Tucson City Council is responsible for the Tucson Police and Fire Departments.

32. The Tucson Police Department is the <u>law enforcement agency</u> responsible for the city of <u>Tucson, Arizona</u>, with a headquarters address of 2705 South Stone Avenue, Tucson, Arizona 85701. The Tucson Police Department, at the highest levels, including Chief Christopher Magnus,

upon information and belief, conspired to murder, and attempted to murder, Plaintiff.

33. Two Hispanic "Doe" Tucson Police Officers" are Police Officers with the Tucson Police Department. The Tucson Police Department, an agency of the City of Tucson, is headquartered at 2705 South Stone Avenue, Tucson, Arizona 85701. These "Doe" Officers conspired with the Nation of Islam, Dustin "Doe" crisis worker, and St. Joseph's Hospital Emergency Room staff to murder Plaintiff on May 3, 2017.

34. Jonathan Rothschild is the Mayor of Tucson, with an office address of, Tucson City Hall, 255 West Alameda, Tucson, Arizona 85701. Jonathan Rothschild, in his official and personal capacity, is responsible for the oversight of the Tucson Police and Fire Departments Upon information and belief, Jonathan Rothschild knew about the Tucson Police and Fire Department's complicity and participation in the Nation of Islam's plot to murder Plaintiff, and did nothing to stop it.

35. Community Intervention Associates, Inc. ("CIA"), is an Arizona corporation, with an office address of 2851 South Avenue B, Building 4, Yuma, Arizona 85364. John R. Gamey, Esquire, is the Registered Agent for Community Intervention Associates, with an office address of Two North

Center Avenue, 15th Floor, Phoenix, Arizona 85004.  CIA employed the crisis worker named "Dustin", who conspired with the Tucson Police Department, and St. Joseph's Hospital Emergency Department staff, to murder Plaintiff, on Wednesday, May 3, 2017.

36. Dustin "Doe" Crisis Worker ("Dustin"), employed by Community Intervention Associates, Inc., is the crisis worker who the "Two Hispanic Doe Tucson Police Officers" called from the Ramada Limited Tucson West, the morning of May 3rd, 2017, to aid and counsel Plaintiff after his attempted murder by bombing at the Motel. Dustin thereafter aided and counseled Plaintiff, by further conspiring with the Two Hispanic "Doe" Tucson Police Officers, Christopher Magnus, Tucson Police Chief, the Tucson Police Department, the City of Tucson, and employees in the Emergency Department at St. Joseph's Hospital, including a "nurse" named "Nick", to murder Plaintiff using heart enlargement medicine at St. Joseph's Hospital in Tucson.

37. Fred Cogburn is the Chief Executive Officer of Community Intervention Associates, Inc., an Arizona Corporation, with an office address of 2851 South Avenue B, Building 4, Yuma, Arizona 85364. Upon information and belief, Fred Cogburn conspired with the Tucson Police to

murder Plaintiff, and gave his assent to Dustin "Doe" Crisis Worker, his employee, to murder Plaintiff. After Plaintiff returned to Tucson the end of March, 2018, to file this lawsuit, upon information and belief, Fred Cogburn further conspired with the Tucson Police Department, to murder Plaintiff, on or about Monday evening, April 2, 2018, after Plaintiff called Fred Cogburn on Fred's cell phone and asked for Dustin's last name. Fred Cogburn refused, saying, "How am I supposed to know his last name--I employ 400 people?" The next day, coming out of Denny's on West Ina Road, Plaintiff was arrested without probable cause by the Tucson Police. Fred Cogburn, upon information and belief, in conspiracy with the Tucson Police, conspired to murder Plaintiff again.

38. SMSJ Tucson Holdings LLC, a Delaware entity is, upon information and belief, the owner of St. Joseph's Hospital in Tucson Arizona. SMSJ's domestic address is 3800 North Central Avenue, Suite 460, Phoenix, Arizona 85012. CHN Holdings, LLC is the Managing Member of SMSJ Tucson Holdings, LLC.

39. CHN Holdings, LLC is a Delaware entity, with a domestic address of 3800 North Central Avenue, Suite 460, Phoenix, Arizona 85012. The

Managing Member of CHN Holdings, LLC is Tucson Hospital Holdings, Inc.

40. Tucson Hospital Holdings, Inc. is a Delaware corporation with an address of 1445 Ross Avenue, Suite 1400, Dallas, Texas 75202. Upon information and belief, Tucson Hospital Holdings, Inc. is a wholly owned subsidiary of Tenet Healthcare Corporation. Upon information and belief, Tucson Hospital Holdings, Inc. regularly conducts business in Arizona.

41. Tenet Healthcare Corporation is a Nevada corporation with a headquarters address of 1445 Ross Avenue, Suite 1400, Dallas, TX 75202. Upon information and belief, Tenet is the primary entity responsible for the operation of Carondelet Health Network, which, upon information and belief, is responsible for the day to day operations of St. Joseph's Hospital.

42. Dignity Health is a California non-profit corporation, with an office address of 185 Berry Street, # 300, San Francisco, CA 94107. It's Registered Agent in Arizona is Paul J. Holman, whose address is 3200 Central Avenue, 23rd Floor, Phoenix, Arizona 85012. Upon information and belief, Dignity Health is a co-owner of St. Joseph's Hospital, through its co-ownership of SMSJ Tucson Holdings, LLC and/or CHN Holdings, LLC., and regularly conducts business in Arizona.

43. Ascension Health, Inc. is a Missouri non-profit corporation, with an office address of 4600 Edmundson Road, St. Louis, Missouri 63134. Ascension co-owns, upon information and belief, along with Dignity Health and Tenet Healthcare Corporation. Ascension Health, Inc., upon information and belief, regularly conducts business in Arizona.

44 Ronald A. Rittenmeyer is the Chairman and Chief Executive Officer of Tenet Healthcare Corporation. Plaintiff attempted to call, and has emailed Ronald Rittenmeyer, dozens of times since May, 2017, regarding what happened at St. Joseph's Hospital, a Tenet owned and managed Hospital. To date, Ronald Rittenmeyer has done nothing to investigate Plaintiff's serious allegations of attempted murder and Radical Islamic Domestic Terrorism at St. Joseph's Hospital.

45. Mark A. Benz is the Chief Executive Officer of St. Joseph's Hospital, with an address of 350 North Wilmot Road, Tucson, Arizona 85711. Via the theory of respondeat superior, Mark A. Benz is personally liable for the acts of his employees, including the attempts on Plaintiff's life by members of the St. Joseph's Hospital Emergency Department staff on May 3,4, & 5th, 2017.

46. Juan Fresquez is the Chief Operating Officer of St. Joseph's Hospital, with an office address of 350 North Road, Tucson, Arizona 85711. Via the theory of respondeat superior, Juan Fresquez is personally liable for the acts of his employees, including the attempts on Plaintiff's life by members of the Emergency Department staff on May 3,4, & 5th, 2017.

47. Nancy Melcher is the Chief Nursing Officer of St. Joseph's Hospital, with an office address of 350 North Road, Tucson, Arizona 85711. Via the theory of respondeat superior, Nancy Melcher is personally liable for the acts of her employees, including the attempts on Plaintiff's life by members of the Emergency Department staff on May 3,4, & 5th, 2017.

48. Vera Walker Daniel is the Chief Human Resources Officer of St. Joseph's Hospital, with an office address of 350 North Road, Tucson, Arizona 85711. Via the theory of respondeat superior, Vera Walker Daniel is personally liable for the acts of her employees, including the attempts on Plaintiff's life by members of the Emergency Department staff on May 3,4, & 5th, 2017.

49. Steven Pike, M.D. is a physician employed by Emergency Medicine Associates. Steven Pike, was the Chief of Staff of St. Joseph's Hospital, is listed as an attending physician on Plaintiff's discharge

paperwork for his E.R. "visit" on May 3, 2017, when members of the Emergency Department attempted to murder Plaintiff, by administering a lethal dose of heart enlargement medicine. Steven Pike's office address is 630 North Alvernon Way, Tucson, Arizona 85711.

50, Adrienne P. Yarnish M.D. is a physician employed by Emergency Medicine Associates. She is also listed on Plaintiff's discharge paperwork as an attending physician for his "visit" on May 3, 2017, when members of the Emergency Department attempted to murder Plaintiff, by administering a lethal dose of heart enlargement medicine. Adrienne Yarnish's office address is 630 North Alvernon Way, Tucson, Arizona 85711.

51. Emergency Medicine Associates is, upon information and belief, a professional partnership which supplies emergency room physicians to St. Joseph's Hospital. Its address is 630 North Alvernon Way, Tucson, Arizona 85711, including the physicians who attempted to murder Plaintiff in the St. Joseph's Hospital Emergency Room on May 3,4, & 5, 2017.

52. St. Joseph Hospital "Doe" Defendants 1-50 include Nick "Doe", Jillian "Doe", Kulnecht "Doe", Sherman "Doe", Chiba "Doe", and Mike "Doe", along with other unknown St. Joseph's Hospital Emergency Department employees, who conspired with the Tucson Police Department

and the Tucson Fire Department Emergency Paramedics and the Nation of Islam on May 3,4, and 5th, 2017. Plaintiff will amend his Complaint when he learns the names of these Defendants.

53. Christopher Magnus is the Chief of the Tucson Police Department, the law enforcement agency for the City of Tucson, with a headquarters address of 270 South Stone Avenue, Tucson AZ 85701. Upon information and belief, Chief Magnus gave permission to individual Tucson Police Officers to conspire with the Nation of Islam to murder Plaintiff during the first week of May, 2017.

54. Tucson Police Officer "Doe Defendants 1-9" are the Police Officers involved in the conspiracy to murder Plaintiff during May 3-5, whose identities are not yet known to Plaintiff. These Defendants include the Tucson Police Officer "Doe" Defendant who Plaintiff witnessed in the actual conspiracy meeting to murder him on May 4, 2017 at the Corner Bakery Cafe on North Wilmot, and at Applebee's Grill + Bar at Park Place Mall on East Broadway the night of May 4, 2017, when that Officer called the Tucson Fire Department Paramedics to come kidnap Plaintiff and transport him to St. Joseph's Hospital to be murdered. The main Tucson Police Department address is 270 South Stone Avenue, Tucson AZ 85701.

When Plaintiff learns the identities of these Officials, he will amend his Complaint.

55. James Critchley is the Tucson Fire Department Chief, with a headquarters address of 300 South Fire Central Place, Tucson, AZ 85701. Upon information and belief, Chief Critchley gave permission to individual Tucson Fire Department paramedics to conspire with the Nation of Islam to murder Plaintiff during the first week of May, 2017.

56. Tucson Fire Department Emergency Services 'Doe" Defendants 1-10 are the the paramedics who kidnapped Plaintiff from Applebee's Bar + Grill and transported him to St. Joseph's Hospital the evening of May 4, 2017, to be executed by the Nation of Islam and staff of St. Joseph's Hospital Emergency Room.

57. General Growth Properties, Inc. "GGP" is, upon information and belief, a Delaware corporation, with a headquarters business address of 110 North Wacker Drive, Chicago, Illinois 60606-1511. GGP owns, upon information and belief, the Park Place Mall, where the Tucson Police Department and the Tucson Fire Department kidnapped Plaintiff from in front of Applebee's Bar + Grill, late on the evening of Thursday, May 4th, 2017, and transported him to St. Joseph's Hospital in Tucson to be

murdered by the Nation of Islam, and staff of St. Joseph's Hospital. GGP had a duty to prevent the Tucson Police and Fire Departments from kidnapping and attempting to murder Plaintiff, on the Park Place Mall property.

58. Cara M. Christ, M.D. is the Executive Director of the Arizona Department of Health Services, with an office address of 150 North 18th Avenue, Phoenix, Arizona 85007.

59. The Islamic Center of Tucson is, upon information, the Radical Islamic organization which supplied the Muslim Cleric who participated in the attempted murder of Plaintiff at St. Joseph's Hospital on Thursday evening and Friday morning, May 4th & 5th, 2017. The Islamic Center of Tucson is an Arizona non-profit corporation with a domestic address of 901 E. 1st Street, Tucson, Arizona 85719. The Agent for Service of Process for the Islamic Center of Tucson is Mir Rehmatullah, whose registered address for service of process is 901 E. 1st Street, Tucson, Arizona 85719. Upon information and belief, Mir Rehmatullah knows the identity of the Muslim executioner who attempted to murder Plaintiff at St. Joseph's Hospital on March 4th & 5th, 2017, and supplied him to St. Joseph's Hospital, so Plaintiff could be executed for Allah.

60. Hassein Hameed Ghanim is the Chairman of the Islamic Center of Tucson. His address is 5461 W. Kara Nicole Court, Tucson, AZ 85742. Upon information and belief, Hassein Hameed Ghanim knows the identity of the Muslim executioner who attempted to murder Plaintiff at St. Joseph's Hospital on March 4th & 5th, 2017, and supplied him for the task of executing Plaintiff for Allah.

61. Ismail K. Zahlan is an Officer of the Islamic Center of Tucson. His address is 4261 North Sunset Cliff Road, Tucson, Arizona 85750. Upon information and belief, Ismail K. Zahlan knows the identity of the Muslim executioner who attempted to murder Plaintiff at St. Joseph's Hospital on March 4th & 5th, 2017, and in fact supplied him for the task of executing Plaintiff for Allah.

62. Lynn C. Hourani is the Treasurer of the Islamic Center of Tucson, with an address of 2072 North Waterview Court, Tucson, Arizona 85749. Upon information and belief, Lynn C. Hourani knows the identity of the Muslim executioner who attempted to murder Plaintiff at St. Joseph's Hospital on March 4th & 5th, 2017, and in fact supplied him for the task of executing Plaintiff for Allah.

63. Taha Hassan is a Director of the Islamic Center of Tucson, who, upon information and belief, knows the identity of the Muslim executioner who attempted to murder Plaintiff at St. Joseph's Hospital on March 4th & 5th, 2017, and in fact supplied him for the task of executing Plaintiff for Allah. Tara Hassan's address is 715 East Lee Street, Tucson, Apartment #20, Tucson, AZ 85719.

64. Abbas Khan is a Director of the Islamic Center of Tucson. Upon information and belief, Abbas Khan knows the identity of the Muslim executioner who attempted to murder Plaintiff at St. Joseph's Hospital on March 4th & 5th, 2017, and in fact supplied him for the task of executing Plaintiff for Allah. Abbas Khan's address is 823 West Vuelta Granadina, Sahuarita, Arizona 85629.

65. Mahmood Saad Alabagi and Abdullah Saad Alabagi are Directors of the Islamic Center of Tucson, with an address of 5490 West Kara Nicole Court, Tucson, Arizona 85742. Upon information and belief, Mahmood Saad Alabagi and Abdullah Saad Alabagi know the identity of the Muslim executioner who attempted to murder Plaintiff at St. Joseph's Hospital on March 4th & 5th, 2017, and in fact supplied him for the task of executing Plaintiff for Allah.

66. The Roman Catholic Diocese of Tucson is an Arizona non-profit corporation, with a domestic address of 111 South Church Avenue, Tucson, AZ 85701. The Roman Catholic Diocese of Tucson, Inc.'s Agent for Service of Process is Gerard R. O' Meara, Esquire, with an address of 1 South Church Avenue, # 1900, Tucson, AZ 85701. Upon information and belief, the Roman Catholic Diocese of Tucson profits from its relationship with St. Joseph's Hospital. When Plaintiff complained to the Roman Catholic Diocese of Tucson, about the Radical Islamic attempts on his life at St. Joseph's Hospital, a Hospital with which the Diocese, upon information and belief, has a business and professional relationship, the Diocese essentially laughed at Plaintiff, and insinuated Plaintiff was a crazy man, and that the Diocese was, in no wise, worried about being sued for damages by Plaintiff. The Diocese has never, upon information and belief, conducted an investigation into Plaintiff's allegations of Radical Islamic Domestic Terrorism and attempted murder at St. Joseph's Hospital.

## FACTUAL ALLEGATIONS

## INTRODUCTION & ORIGINS OF CASE

67. This is a case about white and black police officers, white and black fire department paramedics, white and black nurses, doctors, and medical

technicians, crisis centers and hospitals, the Church of Scientology, and many other defendants, conspiring with the Nation of Islam (Black Muslims) to murder a white man, whose only "crime" was saying the "N-Word".

68. Plaintiff's problem with the Nation of Islam began on Saturday night, December 14, 2013, in South Los Angeles. That night, Plaintiff was the invited guest of Annette Pike at Ms. Pike's apartment at the Van Buren Apartments at the intersection of Van Buren Avenue and Imperial Highway in South Los Angeles. Ms. Pike's boyfriend, an African-American male named Vince Allen, who Plaintiff had never met before, and without provocation, physically threatened Plaintiff's life, causing Plaintiff to have to flee Ms. Pike's apartment late that night, without his luggage.

69. When Plaintiff drove back over to Santa Monica, Plaintiff, in anger, sent some text messages to Brandy M. Thomas, Plaintiff's African-American girlfriend, who was still back at Ms. Pike's apartment.

70. Plaintiff used the "N-Word" and made some other disparaging remarks about Mr. Allen.

71. On January 1, 2014, Plaintiff attracted the ire and attention of a large group of African American males and Los Angeles Police Department Officers, and Los Angeles Fire Department paramedics, which resulted in

the first attempt on Plaintiff's life at Good Samaritan Hospital in downtown Los Angeles.

72. Plaintiff survived that attempt, but continued to have life threatening problems of a similar nature during January, 2014, but did not understand why.

73. Finally, the end of January, 2014, Annette Pike explained to Plaintiff what happened--that Vince Allen had taken Ms. Thomas' cell phone with Plaintiff's "racist" text messages to Nation of Islam Muhammad Mosque #27 in South Los Angeles, Student Minister Tony Muhammad, and that the Nation of Islam ("Black Muslims") had made Plaintiff a "Person of Interest".  Plaintiff later determined that a "Person of Interest" in Black Muslim parlance is someone they will kill if they can.

74. Since that time, there have been multiple murder attempts against Plaintiff's life, involving a conspiracy between the Nation of Islam, local police departments, local fire department paramedics, hospitals and many others in the following cities--Santa Monica, CA, Los Angeles, CA, Redding, CA, Albuquerque, NM, Santa Fe, NM, Mesa, AZ, Tucson, AZ, Torrance, CA, and Culver City, CA. For a more complete recitation of the origins and history of events in this case, there is a companion Case which

was filed in the Central District of California in September, 2017. That Case

number is 2:17-cv-06912. The Complaint in that filing recounts more fully

the Case history, except for recent events and murder attempts on Plaintiff's

life in Torrance, CA, and Culver City, CA on January 5, 2018, and January

12, 2018.

## FACTUAL ALLEGATIONS SPECIFIC TO ARIZONA

75. The beginning of October 2016, Plaintiff arrived in Phoenix, AZ,

after spending a week in Flagstaff. On Tuesday, October 4, he came down to

the lobby of the San Carlos Hotel in downtown Phoenix where he was

staying, and the lobby was filled with Nation of Islam operatives including,

"David Muhammad", who Plaintiff had seen before in Redding, CA and

Albuquerque, NM, when the N.O.I. was terrorizing and attempting to

murder Plaintiff in those municipalities. And, Plaintiff was terrorized. The

N.O.I. chased Plaintiff from the San Carlos Hotel to Scottsdale, where

Plaintiff took refuge in the E.R. at Scottsdale Osborn Medical Center, and

called the Scottsdale Police. The Scottsdale Police responded and Plaintiff

made a report.

76. On Wednesday, October 19th, 2016, Plaintiff was working on his

computer at the Lost Dutchman Coffee House in downtown Mesa, AZ. Two

African-American males came in at the same time. One of them was glaring at Plaintiff and talking on his cell phone, gesticulating wildly. Plaintiff heard him say something to the effect of, "Why can't we just hit him here?" At that point, Plaintiff grabbed his knapsack and ran out of the coffeehouse, and called the Mesa Police. The Mesa Police responded quickly, as Plaintiff observed other African-American males arriving on the scene. And Plaintiff was terrorized. It appeared, upon information and belief, the Mesa Police were aware of Plaintiff's "problem" with the N.O.I. They expressed concern about how Plaintiff was planning to get back to his house.

77. On Friday afternoon, October 28, 2016, as Plaintiff was keyboarding a letter to law enforcement at the Mesa Public Library, about 15 African-American persons, male & female, upon information and belief, acting on instructions from the N.O.I., came into the library at about the same time. Plaintiff had eye contact with several of them, and it was clear, again, to Plaintiff, that he was under surveillance, and being intimidated, upon information and belief, by operatives of the N.O.I. And Plaintiff was afraid.

78. On Thursday night, November 3, 2016, Plaintiff was staying at a Motel 6 in Phoenix. After spending a couple of hours there, Plaintiff called 911. The

Dispatcher asked if Plaintiff was in crisis, and if would he like to go to a crisis center called Community Bridges, Inc. a mental health agency located in Mesa. Having been to Community Bridges the previous week to get a refill for some medicines, Plaintiff agreed.

79. It did not take long for a van with a male driver and a female co-driver to arrive. The trip to CBI was uneventful, but Plaintiff had a sense of foreboding.

80. When Plaintiff got to CBI, at 358 E. Javelina Avenue, Mesa, AZ 85210, the staff would not allow him inside the actual crisis center – he was kept in a small room separate and away from the main area, with a door that led outside. and away from all patients and staff.

81. Plaintiff's cell phones were confiscated, and as he had a very unwell feeling, Plaintiff started begging the staff to please let him call his family, to let them know where he was, but the staff would not allow him the use of his phones, nor did any CBI staff member try to aid or console Plaintiff. And Plaintiff was terrified.

82. Plaintiff got up to bang on the window of the interior door of the crisis center, and he could see that there was a lot of non-verbal facial communication going on among the managerial staff, and, upon information

and belief, it was about him and Plaintiff knew from experience that it did not bode well for him. And Plaintiff was terrified.

83. Mesa Fire Department paramedics arrived eventually, and again, it was not a favorable situation for Plaintiff. He was put in the ambulance, and despite his pleading, the paramedic put an I.V. in his arm and injected medication that immediately started to increase his heart rate, soon to over 200 bpm. This was the same method by which the Nation of Islam had tried to murder him before, in Los Angeles, CA and Albuquerque, NM, and other municipalities, using local fire department paramedics and hospitals.

84. Plaintiff pleaded with the paramedic not to kill him – and told him the Nation of Islam had already tried to kill him this way numerous times, and that what the paramedic was doing to him was murder.

85. Plaintiff was transported to the Banner Desert Medical Center Emergency Room, and there his nightmare continued. The nurses assigned to Plaintiff were completely hostile to Plaintiff – they also confiscated and denied him the use of his cell phones to call his family. Plaintiff continued to plead with the nurses to allow him to call his family.

86. One brunette nurse sent for security and three security guards appeared, one of obvious Middle Eastern descent, laughing and joking about Plaintiff's

plight. A doctor made an appearance, didn't examine Plaintiff, then quickly left.

87. Plaintiff continued protesting to the nurses, and they were extremely hostile towards Plaintiff, including a brunette nurse., who emptied his knapsack and remarked negatively that Plaintiff had "two Bibles". Plaintiff continued to beg her to let him use his cell phone to call his family, but she would not.

88. Then, the nurse looked at the security guards and said something to the effect of, "Can you do something about this guy?"

89. One security guard said to the Muslim guard, "Shall we go get a plastic bag?" and Plaintiff became very terrified for his safety. He began calling out in distress that his life was in danger and would someone please help him.

90. Everyone in Plaintiff's room then disappeared, and a while later, another nurse who appeared to be friendly came in and gave Plaintiff a shot of something which quickly put him to sleep.

91. The next morning another friendly nurse appeared as soon as Plaintiff was awake. There was no conversation about what happened the previous night – she just came in and handed Plaintiff discharge papers.

92. Later that day, Plaintiff was furious that a large healthcare organization like Banner Health could have employees who would aid and abet the Black Muslims in attempted murder, and Plaintiff contacted Peter Fine, Banner Health's C.E.O., but Peter Fine's office did not take Plaintiff's complaints of complicity with terror organization seriously. Peter Fine later blocked Plaintiff's email address, and Banner Health never investigated Plaintiff's allegations of attempted murder at Banner Desert Medical Center.

## DEATH THREATS ON ELECTION EVE

93. On Tuesday evening, November 8th, 2016, while living in Gilbert, AZ, Plaintiff received the following text messages on his cell phone from this number: 623.335.6715:

7:56 P.M. – **"We see YOU in that two story house."**

**"Apologies aren't enough."**

7:59 P.M. – **"You underestimate us. Sleep tight."**

8:38 P.M. – **"Just getting ready to set an example."**

94. Plaintiff called the Gilbert Police Department and Officers Guerra and Wood responded. Plaintiff showed them the text messages, and gave them the number the texts came from. The Incident Report # is G16000157338.

95. Plaintiff subsequently sent a letter to Gilbert, AZ Police Chief Tim Dorn, and two days later he (Plaintiff) received a call from Counter-Terrorism Detective James Dana of the Gilbert Police Department, inviting Plaintiff down to the Police Station to see if Detective Dana could help Plaintiff get some "resolution" to his problem.

96. Plaintiff was very encouraged, because after almost three years of pleading with federal law enforcement officials to investigate the campaign of terror & attempted murder that had been waged against him by the Nation of Islam, the Church of Scientology, Police and Fire Departments in three states, and health care agencies, and getting zero response from anyone, Plaintiff hoped that Detective Dana could help him.

97. Plaintiff did go to the Gilbert Police Station on Friday afternoon, November 14, 2017, and Detective Dana was very friendly, and took a lengthy recorded statement from Plaintiff.

98. Plaintiff thereafter got the impression that Detective Dana did try to get the attention of the F.B.I., and perhaps did have contact with Special Agent Mike DeLeon's office in Phoenix.

99. But, Plaintiff has never heard anything from the Bureau, and he does not know the status of an investigation, if any.

35

100. Plaintiff soon moved to another house in Chandler, AZ. Every time he left the house, Plaintiff was surveilled and openly intimidated by a large group of NOI operatives, Church of Scientology operatives, motorcycle gang members, and Sunni Muslims of Middle Eastern descent, upon information and belief, from the local Mosques in the Phoenix area. The only way that Sunni Muslims would be aware of Plaintiff's existence was if the Nation of Islam had solicited their help in the NOI's terror campaign against Plaintiff.

101. Plaintiff wrote several emails to "Bod" at Masjid Abu Bakar, complaining that Sunni Muslims were surveilling him and intimidating him in public places (like, e.g., Starbucks) in Mesa and Phoenix, and to please stop, or Plaintiff would sue them. Plaintiff never heard back from the Masjid (Mosque). "Bod" later discontinued his email address.

102. Plaintiff repeatedly called the Church of Scientology of Arizona in Phoenix, because there were so many Caucasian people surveilling him and terrorizing him, in addition to African-Americans, that Plaintiff knew, upon information and belief, they were COS operatives. The Nation of Islam and the Church of Scientology have a relationship that goes back many years. The COS built a church in Inglewood, CA with the cooperation of the

Nation of Islam. A number of NOI Student Ministers have become Scientology "Auditors". Plaintiff would also receive bizarre phone calls from Caucasian people who were obviously COS operatives, leaving strange and intimidating and terrifying messages on his cell phone. Plaintiff called the COS Director of Special Affairs for Phoenix, Ginny Leason, to complain about the terrorism of the COS and was told numerous times that Ms. Leason would call him back, but no one from the Church of Scientology of Arizona in Phoenix ever called Plaintiff back to discuss his complaints, or if the COS was involved. Upon information and belief, the conspiracy to murder Plaintiff with the Nation of Islam was given approval at the highest level of the Church of Scientology, David Miscavige, who provided, upon information and belief, manpower, money, technological & strategic support to the Nation of Islam for its campaign of terror and attempted murder against Plaintiff.

103. Plaintiff also called the Chandler Police Department multiple times, because of the sheer number of people surveilling him when he would leave his house. Depending on from where Plaintiff was calling when he called, at times the calls would be referred to the Maricopa Sheriff's Department for jurisdictional reasons.

104. At that point, Plaintiff gave up trying to live in Phoenix, and decamped to his hometown of Philadelphia, PA, the beginning of December, 2016, for the Holidays. His time there was, essentially, without interference by the Nation of Islam.

## TUCSON – SPRING 2017

105. After attending the Sundance Film Festival in Park City, UT in January, 2017, on or about March 2, 2017, Plaintiff traveled to Tucson, AZ to visit a friend he had met online, Chloe Morrison. Plaintiff had made Chloe basically aware of the problem he had experienced with the Nation of Islam.

106. Plaintiff spent the first two weeks of March at Chloe's house on East Juniper St. in Tucson, then moved over into a house she owned at 6426 East Duke Street, off Wilmot Road in Tucson.

107. The end of April, 2017, Plaintiff flew to Philadelphia for the funeral of his younger sister, Victoria Van Loan.

108. Plaintiff returned to Tucson on Monday evening, May 1, 2017, and Chloe, for reasons unbeknownst to Plaintiff, had changed the lock on the front door of the Duke Drive house. Plaintiff's African-American roommate named Matthew let him in.

109. Plaintiff left the house the next day, and, very upset about being unlawfully evicted, spent the night in Room 146 at the Ramada Limited Tucson West at 655 N. Freeway, Tucson, AZ 85745, owned by Himada Properties LLC and Jagdish Patel. A young lady he had met earlier in the evening named "Melanie" had suggested the Ramada Limited Tucson West as an affordable place to stay.

110 About 8:00 A.M. that next morning, Wednesday, May 3rd, 2017, Plaintiff observed that what appeared to be the TV cable box, was making strange ticking noises, and softly playing a sinister sounding audible melody.

111. Right about that time, Plaintiff heard a rapid succession of three knocks on his door, and he shouted, "Who is it, who is it?" No one answered, but about two minutes later Plaintiff heard another rapid succession of three knocks again on his door. Again, Plaintiff shouted, "Who is it?" and there was again no answer, but this time he heard an African-American male voice outside his door yell to someone, "OK, we gotta go, we got business to take care of!"

112. At that point, Plaintiff realized that the cable box was a bomb. Plaintiff started screaming at the top of his lungs, "There's a bomb in here, there's a bomb in here!" and started calling the front desk, while lying on the

bathroom floor as far away from the bomb as he could get, praying that it would not go off.

113. About 10-15 minutes later, Plaintiff heard a female Motel staff member outside his door.  Shortly thereafter, Plaintiff heard Tucson Police Officers ("TPD") knock at his door and identify themselves as such.

114. Plaintiff ran out of his room without his shoes, and two Hispanic TPD Officers asked him to come down to the Motel Office to speak with them.

115. Plaintiff did not observe a bomb squad on the premises or any other typical procedures or protocols being performed to investigate whether or not a bomb was in his room - Plaintiff was simply taken to the Motel lobby and detained there, for almost an hour.  Motel Manager Laurel Pavlik was not present at the time.

116. At one point one of the Hispanic Officers informed Plaintiff that a Tucson Crisis worker had been called and was on his way. Plaintiff was not opposed to the idea.

117. Soon, a Caucasian male crisis worker named, upon information and belief, "Dustin", with dark hair and glasses and about 35 years old, arrived at the Motel.

118. The Police Officers suggested that Dustin and Plaintiff speak privately in the Motel Manager, Laurel Pavlik's, office, which they did.

119. Plaintiff explained to Dustin a brief history of his problem with the Nation of Islam and indicated that he was probably set up the night before, using the female "Melanie" to lure him to the Ramada Limited Tucson West, where it was, upon information and belief, already pre-arranged to put Plaintiff in room 146, where, upon information and belief, the N.O.I. had already planted a bomb.

120. After Plaintiff and Dustin spoke for about 15 minutes, the TPD Officers informed Plaintiff that he could now go back to his room and get his belongings. The Officers had detained Plaintiff, upon information and belief, long enough to allow the Nation of Islam to remove the bomb the they had placed in his room, and replace the actual cable box.

121. On the way back to his room, Plaintiff, observed in another room on the ground floor in the back of the Motel, near Plaintiff's room, with the door open, from the back, a large African-American man wearing a blue denim jacket, blue jeans, and a black cowboy hat. Upon information and belief, that black man was an Nation of Islam operative supervising the murder

attempt by bombing against Plaintiff, possibly, upon information and belief, from Nation of Islam Muhammad Mosque in Tucson.

122. Plaintiff also observed a big Tucson Police Department SUV idling in the vicinity of his room, with an African-American Officer of a higher rank, sitting in the driver's seat, grinning at Plaintiff, like a black Cheshire cat. Plaintiff also observed a Caucasian man of about 60 years of age, with a goatee, grinning at him, and Plaintiff surmised that this was the N.O.I. operative who, upon information and belief, both planted and removed the bomb in Plaintiff's room.

123. After Plaintiff got his belongings, he asked Dustin if Dustin would give Plaintiff a ride back to the house where Plaintiff was staying, on East Duke Drive.

124. Dustin said "Yes", but on the way back, Plaintiff observed that Dustin was not going in the right direction (East), and appeared to be driving into a desolate part of town. Plaintiff had to demand that Dustin take the most direct, populated route, and Dustin then complied with Plaintiff's demand.

125. Once they were driving East on Broadway, Dustin suggested that he take Plaintiff to a Hospital, for Plaintiff to get medically evaluated. Plaintiff agreed that it was a good idea. Because Plaintiff had gotten a prescription

refilled a couple of weeks previously at St. Joseph's Hospital on Wilmot Road, Plaintiff suggested they go there.

126. Dustin agreed, but when they arrived at St. Joseph's Hospital Emergency Room, Dustin informed Plaintiff that he (Dustin), wanted to speak with the Emergency Room staff before Plaintiff was seen. Plaintiff agreed, and sat in the waiting room while Dustin went back into the E.R.

127. After about 10 minutes, Dustin emerged from the Emergency Room, and walked quickly through the waiting room where Plaintiff was sitting, waving "Goodbye", but saying nothing to Plaintiff.

128. Plaintiff was then called back into the E.R., and a Caucasian man with reddish brown hair, about 40 years old, who identified himself as a "nurse named Nick" took Plaintiff's blood pressure. Plaintiff noted that Nick appeared to be agitated. Plaintiff told Nick that he had been up all night, felt great, but because he was a 58 year old man, he had come to the E.R. to make sure his heart was functioning properly.

129. Nick took Plaintiff back to a bed in the E.R., where Nick seemed nervous and preoccupied. Plaintiff asked if he might get an E.K.G., but Nick appeared to be flustered. Nick left, then came back with a small bottle of medicine, which he then injected into Plaintiff's right arm, at the elbow.

Plaintiff observed that Nick was doing it inexpertly, and blood was running down Plaintiff's arm.   Immediately after Nick injected the medicine, Plaintiff developed cardiac symptoms in his chest. Nick ran out of the room, and Plaintiff continued to experience increasing extreme discomfort in his heart. Nick had left the bottle of medicine on the table next to Plaintiff's bed. Plaintiff picked it up and read the label - it was "Heart Enlargement" medicine.

130. Plaintiff got up from his bed and walked into the E.R., yelling "What did you do to me – you're murdering me!"

131. Plaintiff demanded to call his 87-year old Mother in Philadelphia. The E.R. staff obliged him, allowing Plaintiff to make the call from a Hospital phone, and when his Mother answered, Plaintiff started to protest and cry to his Mother, that he was in a hospital named "St. Joseph's Hospital" being murdered by the Nation of Islam and the Hospital staff.

132. At that point, E.R. staff grabbed the phone away from Plaintiff and he was led forcibly by four or five hospital staff members of both Caucasian and African-American ethnicity to an isolation room and placed in restraints on a bed. All the while Plaintiff begged them to please not let him die.

133. The staff left and closed the door, leaving Plaintiff in restraints to die. And Plaintiff was extremely terrified. Plaintiff began to pray to God, the "God of Abraham, Isaac and Jacob", the Father of Our Lord and Savior Jesus Christ, to neutralize the effects of the heart enlargement medicine, the bottle which he still had in his hand.

134. Plaintiff was in that isolation room for at least a couple of hours, and slowly recovered from the "lethal" dose of heart enlargement medicine that Nick had administered to him, all the while praying to God for help.

135. A little while later, an attractive brunette nurse about 33 years old came into the isolation room and confiscated the medicine bottle from Plaintiff, saying "I need this". She also informed Plaintiff that she had called Plaintiff's Mother again, and this was very upsetting to Plaintiff, because Plaintiff knew that whatever that nurse had told his Mother, she had lied.

136. A little while later, the same attractive brunette nurse brought his discharge papers, and Plaintiff was discharged from the Hospital.

137. Plaintiff returned home, and after a while, changed clothes and walked back to St. Joseph's Hospital Emergency Room, and asked to see the charge nurse on duty.

138. A female nurse named, upon information and belief, "Jillian" about 35 years old with light brown hair came out to speak with Plaintiff, and Plaintiff said to her, "I came back here for two reasons: One, I want you to see a walking miracle, and two, to tell you I am going to sue this Hospital."

139. "Jillian's" cheeks became very flushed and red, and she quickly walked back into the E.R.

140. Plaintiff did not feel comfortable returning home that night, so he spent the night at the DoubleTree Suites by Hilton Hotel, at 5335 East Broadway, Tucson, AZ 85711.

141. The next morning, Plaintiff opened his window curtain, and there was an African-American N.O.I. operative standing 10 feet away his window watching him.

142. Plaintiff observed persons of a suspicious appearance in and around the lobby area, so he telephoned the Tucson Police non-emergency line, and asked for an officer to come talk to him. A male police officer got on the line and informed Plaintiff that no officer would be responding to his call.

143. Plaintiff eventually checked out, and went to the Corner Bakery Café at 203 South Wilmot Road in Tucson. It was now Thursday, May 4th, about 2:00 P.M. There Plaintiff began communicating with federal law

enforcement personnel via email about what had happened to him the day before at the Ramada Limited Tucson West, and at St. Joseph's Hospital.

144. While he was communicating online, Plaintiff observed a group of 6-8 people at a table in the Café, a mixture of African-Americans and Caucasians, who Plaintiff assumed were from the Nation of Islam and the Church of Scientology. Plaintiff also assumed that the meeting was about him.

145. Soon, a male Caucasian Tucson Police Officer about 55 years old, with light colored hair, entered the Café, looked at Plaintiff with a flash of recognition, and joined the others at the table.

146. That party eventually left, and Plaintiff, assuming he was "out of the woods", walked back to the house at Duke Drive. The door was unlocked and Plaintiff went inside the house, to his room and prepared to get some rest.

147. About an hour later, Plaintiff heard his African-American roommate Matthew exit his (Matthew's) room, and talk on his cell phone in the hallway adjacent to Plaintiff's room.

148. Curious, Plaintiff put his ear to his door and listened. Plaintiff perceived that Matthew was speaking about him. Plaintiff heard Matthew say, upon

information and belief, "Chloe lives at her house, and "he" and I live here, that's all who's here." Plaintiff heard Matthew end the call, and go back into his room.

149 After a minute, Plaintiff exited his room and knocked on Matthew's door. Matthew answered, and Plaintiff asked him, "Matthew, were you just talking to someone about me? I have, like, enemies, were you possibly talking to them about me?"

150. Matthew's eyes got very wide, and he said this these words to Plaintiff, in a very terrified tone, "Man, you'd better get out of here RIGHT NOW!"

151. Terrified, Plaintiff immediately went into his room, grabbed his sweatshirt and cell phone, and ran out of the house.

152. Because Matthew's tone was so alarming, Plaintiff assumed that the Nation of Islam were on the way to the Duke Drive house to murder him. Plaintiff was very terrified as he ran West on Duke Drive towards Wilmot Road. Because he had taken his contact lenses out when he had gotten home, Plaintiff couldn't see very well.

153. When Plaintiff started running North on Wilmot Road, he could make out the silhouettes of African-American males in the parking lots of various businesses. At one point, Plaintiff threw his cell phone away.

154. While he was running, Plaintiff had his hands up and was yelling, "Fellas, please do not shoot me!" Plaintiff was terrified of being shot in the dark.

155. Plaintiff rounded the corner on Broadway, and started to run West on Broadway. As Plaintiff is an asthmatic, he began to have trouble breathing.

156. As Plaintiff ran into the parking lot at Park Place Mall, Plaintiff observed cars driving towards him, herding him, in a manner of speaking, as if he were a cow.

157. Up ahead, Plaintiff saw that Applebee's was still open, and Plaintiff had hope he could take refuge there. Then, Plaintiff's heart sank, because he observed a Tucson Police Department cruiser parked in front of the restaurant, with its lights on.

158. Plaintiff ran up the stairs to the entrance of Applebee's and collapsed on the bench in front of the restaurant. He could not run any further.

159. There were African-American N.O.I. operatives standing in the parking lot, and Plaintiff knew immediately that the Tucson Police were hostile to him. And Plaintiff was terrified.

160. There were patrons going in and out of the restaurant, and some of them looked startled. At one point, the Caucasian male restaurant manager, about

45 years old with brown hair, came out, but the Police told him that they had the situation under control, or something to that effect.

161. Within a few minutes, a Tucson Fire Department ambulance pulled up, and against his will, Plaintiff was placed on a gurney, and put inside the ambulance.

162. Once inside, Plaintiff knew immediately the paramedics were conspiring with the Nation of Islam and the Tucson Police to murder him. They began hooking him up with I.V.'s and putting things in his head, and they were laughing and talking about Plaintiff's plight. They told Plaintiff that he was a "dead man".

163. Plaintiff was transported to St. Joseph's Hospital, and when he arrived at the Emergency Room, and the ambulance doors opened, he heard an African-American female voice say loudly from the parking lot, in a sinister and sardonic tone, "Welcome!"

164. Plaintiff was taken into the Emergency Room, and immediately, a team of people began to murder him, like an animal. And Plaintiff was terrified.

165. There was a Native American man, about 55 years old, with a grey ponytail down his back, named "Mike", who appeared to be in charge of Plaintiff's murder.

166. There were three black males present, who put on blue rubber gloves and looked at Plaintiff with animosity in their faces. One man had the first name of, upon information and belief, "Sherman", or some other name that began with an "S". There was another black man from Nigeria named "Chiba".

167. There was an Islamic man of Middle Eastern descent present, who apparently was going to mutilate Plaintiff's body upon his death. The people present at Plaintiff's bedside were discussing it with this man, as to how he was going to mutilate Plaintiff's body. The Middle Eastern Muslim cleric had his own "tent" set up next to Plaintiff's bed, and shortly disappeared into it, and Plaintiff heard what appeared to be the Muslim man going into some kind of a trance. There were strange electronic or radio emissions coming out of his "tent". And Plaintiff was terrified.

168. One of the African-American men was heating up instruments in an oven, such that, it appeared that, he too, was preparing to mutilate Plaintiff's body.

169. Plaintiff was terrified that he was going to be tortured before he died.

170. A Caucasian man named "Kulnecht" appeared and took a seat by Plaintiff's bed, and began badgering Plaintiff, asking him questions like,

"Why are you so obsessed with yourself?", and "Can't you think about anybody else?" Kulnecht asked Plaintiff these apparently rhetorical questions as Plaintiff was lying in his bed, being put to death for Allah.

171. Plaintiff asked the Native American man named Mike why he was helping to murder Plaintiff, as they had never met before, and had no trouble with each other, but Mike had no answer.

172. At one point, "Nick" the man who had attempted to murder Plaintiff the day before with the lethal dose of heart enlargement medicine, stopped by Plaintiff's bed. He seemed to be somewhat bemused at Plaintiff's predicament, but didn't have much to say.

173. At about 30 minutes to his death, a female nurse began counting down Plaintiff's Life expectancy in five minute intervals.

174. Plaintiff began to ask his God, "El Elyon", The "Most High God", the "God of Abraham, Isaac, and Jacob", and His Son Jesus Christ, to help Plaintiff "make it to the Other Side."

175. A male middle-aged Caucasian physician stopped by Plaintiff's bed, presumably to fill out pre-death paperwork. Plaintiff attempted to speak with him about Plaintiff's predicament, to no avail. The physician left after a few seconds.

176. With 5 minutes of life expectancy left, a telephone rang in the E.R. Plaintiff heard a female voice answer the phone and overheard the female voice speaking with the person on the other end of the line. Plaintiff perceived that the conversation was about him, and though he felt near to death, he strained to hear the conversation. The caller on the other end of the line was apparently aware of Plaintiff's predicament, because Plaintiff overheard the female on the phone talking about Plaintiff.

177. As soon as the call, which lasted a few minutes, ended, "Mike", who Plaintiff had not seen in about the preceding 30 minutes, walked quickly to Plaintiff's bed. Reaching up, "Mike" turned on the saline solution, which had been a slow, intermittent drip, to a steady stream. Plaintiff thought this was significant, and, within two minutes, his body began to feel differently.

178. Plaintiff then asked Mike, "Hey, Mike, I don't feel like I'm dying anymore.", to which Mike responded, "No, it looks like you're going to be around for a while."

179. As Plaintiff's death squad, in a single file, exited the area near Plaintiff's bed, Plaintiff overheard the black man, upon information and belief, named "Sherman" say, "I hope "they're" not going to make me out to be the "bitch" for this."

180. Soon, it became apparent that Plaintiff was going to be admitted to the Hospital. An Indian physician came by Plaintiff's bed, and was obviously solicitous and apologetic, but Plaintiff was too angry to speak with him, saying, "These people just tried to kill me, I have nothing to say to you!"

181. Against Plaintiff's will, he was admitted to an upstairs floor, and a man was assigned to sit with Plaintiff. Plaintiff was very upset and continued to remonstrate that he did not want to be in a Hospital that had tried to murder him.

182. Around 6:00 A.M., a female physician of Middle Eastern descent appeared in Plaintiff's room, and Plaintiff demanded that he be released, because the E.R. staff had tried to murder him. The physician said she could not release Plaintiff, and Plaintiff threatened to sue her for medical malpractice. The physician then left.

183. In about an hour, the female physician returned with the physician in charge of the hospital's psychiatric department. That physician told Plaintiff the Hospital could not hold him against his will. Plaintiff agreed and shortly thereafter, Plaintiff was discharged.

184. Later that day, Plaintiff attempted to get his personal property from the house on Duke Drive, but it became apparent that it was not safe for him to

return to that location, because the Nation of Islam was still trying to kill him.

185. Plaintiff went to the Tucson airport that night, with just the clothes on his back. Present that night, in an area very close to where Plaintiff was, in the baggage claim area, was the Muslim man of Middle Eastern descent, wearing street clothes and apparently expensive multi-colored sneakers, who was present at Plaintiff's attempted murder the night before, at St. Joseph's Hospital.   With him was an African-American male Nation of Islam operative who Plaintiff recognized. Plaintiff was too exhausted to do anything, and there was no one he could call for help, so Plaintiff went to sleep.

186. The next morning, Plaintiff flew to Hartford, CT and spent the rest of the month of May in New Haven on the Yale University campus, attempting to recover from his experiences in Tucson.

187. Plaintiff returned to California the beginning of June, 2017, and served timely Tort Claim Notices on all Tucson government Defendants.

188. Plaintiff returned to Tucson the beginning of April, 2018, to file this Lawsuit.

189. Though Plaintiff emailed many of the Defendants in this lawsuit, many times, beginning in May, 2017, he has never heard back from a single representative of St. Joseph's Hospital, the City of Tucson, the Police or Fire Departments, the Arizona Department of Health Services, or Arizona Attorney General Mark Brnovich. Likewise, not one individual from Tenet Healthcare Corporation, Dignity Health, or Ascension Health has ever communicated back with Plaintiff regarding Plaintiff's serious allegations of attempted murder and Radical Islamic Domestic Terrorism at a Hospital they own.

190.. Plaintiff's life has no value to these Defendants.

191. Plaintiff, as the direct and proximate result of the events described herein, suffered and continues to suffer severe Post Traumatic Stress Syndrome, and severe emotional distress. Plaintiff cannot hear a siren without feeling dire fear that law enforcement officials are coming for him, in order to execute him for the Nation of Islam and Allah. Plaintiff also experiences extreme emotional distress when he sees a black person, anywhere in his vicinity, as they may be a member of the Nation of Islam, and conspiring to murder him.

192. Plaintiff, several years ago, on Nation of Islam Mosque #27's Website, apologized to Vince Allen for Plaintiff's "racist" text messages, sent in anger, to Brandy Thomas, the morning of Sunday, January 15, 2013.

193. Plaintiff's apology has not been accepted.

194. On Friday, April 20, 2018, at approximately 4:00 P.M., Nation of Islam operatives surveilled and intimidated, and, upon information and belief, conspired to murder Plaintiff, at the Starbucks located at 629 East Speedway Boulevard, Tucson, AZ 85712.

195. Feeling the threat was very dire, Plaintiff took a LYFT to the Eastside Meeting Place located at 6061 East Broadway Boulevard, Tucson, AZ 85711, to attend an A.A. meeting, believing it would be safe.

196. However, M. Omar Rasul, along with other N.O.I. followed Plaintiff into the meeting, and intimidated Plaintiff in the meeting, non-verbally.

197. Plaintiff frantically posted on his Facebook page asking for prayer, and towards the end of the meeting, the plot seemed to dissipate, as N.O.I. operatives got up and left the meeting early. After the meeting, M. Omar Rasul seemed to give Plaintiff a non-verbal cue that the immediate danger to Plaintiff's life was over. Plaintiff called the F.B.I. tip line to report the incident.

198. Several times during the week of Sunday, April 22, 2018, Nation of Islam operatives have followed Plaintiff into two different Starbucks and a restaurant in Tucson. On Saturday, April 28, 2018, Plaintiff again called the F.B.I. tip line from outside a Starbucks in the Park Place Mall. Despite the fact that the multiple attempts on Plaintiff's life over four years have failed, (because of the Grace of God) the Nation of Islam still seems determined to harm Plaintiff.

199.. It is Plaintiff's sincere hope that this Lawsuit will stop them.

### COUNT ONE- ASSAULT - AGAINST THE NATION OF ISLAM, LOUIS FARRAKHAN, TONY MUHAMMAD, & MIKAL OMAR RASUL

200. Paragraphs 1 through 199 are incorporated herein, as if fully set forth at length.

201. Defendants the Nation of Islam, Louis Farrakhan, Tony Muhammad, and Mikal Omar Rasul, through all of their acts described in this Complaint, including attempting to murder Plaintiff multiple times, have intended to cause harmful and offensive contact with Plaintiff, and have in fact caused Plaintiff fearful apprehension of such immediate harmful and offensive

contact, and Plaintiff has been severely damaged physically, mentally and emotionally as the direct result of Defendants' actions.

## COUNT TWO - ATTEMPTED MURDER (BATTERY) - AGAINST THE NATION OF ISLAM, LOUIS FARRAKHAN, TONY MUHAMMAD, & MIKAL OMAR RASUL

202. Paragraphs 1-201 are incorporated herein as if fully set forth at length.

203. Defendants the Nation of Islam, Louis Farrakhan, Tony Muhammad, and Mikal Omar Rasul, through all of their acts described in this Complaint, including attempting to murder Plaintiff multiple times, intended to cause harm or offensive contact with Plaintiff, and caused such harmful and offensive contact with Plaintiff by trying to murder him on multiple occasions at St. Joseph's Hospital and the Ramada Limited Tucson West, with bombs designed to explode, and with medications injected into his body, designed to kill him, and, as the direct result of these attempted murders, Plaintiff has been severely physically, mentally & emotionally damaged, and his Bipolar Disorder exponentially aggravated.

## COUNT THREE- FALSE IMPRISONMENT - AGAINST THE NATION OF ISLAM, LOUIS FARRAKHAN, TONY MUHAMMAD, & MIKAL OMAR RASUL

204. Paragraphs 1-203 are incorporated herein as if fully set forth at length.

205. Through the actions described in this Complaint, Defendants acted to restrain Plaintiff to an area within Defendants' control, in hospitals, and ambulances, and motel rooms with planted bombs, and Defendants acted without lawful authority and without Plaintiff's consent, and Defendants' actions resulted in the direct restraint of Plaintiff's liberty and freedom of movement, either by actual force or fear of force, and Defendants' acts would have caused a reasonably prudent person in the same situation as Plaintiff to believe that he was restrained, and Plaintiff was both aware of, and extremely harmed by, the restraint, and severely damaged as a result, physically, mentally, and emotionally.

## COUNT FOUR - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS - AGAINST THE NATION OF ISLAM, LOUIS FARRAKHAN, TONY MUHAMMAD, & MIKAL OMAR RASUL

206. Paragraphs 1-205 are incorporated herein as if fully set forth at length.

207. Defendants' conduct in attempting to murder Plaintiff by bombing, and utilizing law enforcement officials and Catholic Hospitals and Sunni Muslim Executioners, and Hospital Emergency Room members to assassinate Plaintiff, was extreme and outrageous, and Defendants' conduct was intentional, and designed to cause Plaintiff extreme emotional distress, and

Plaintiff has in fact, suffered severe emotional distress, and been permanently damaged as the result.

### COUNT FIVE - ASSAULT - AGAINST DAVID MISCAVIGE - THE CHURCH OF SCIENTOLOGY INTERNATIONAL - THE CHURCH OF SCIENTOLOGY OF ARIZONA - VIRGINIA LEASON AND DIANE KOEL

208. Paragraphs 1-207 are incorporated herein as if fully set forth at length.

209. Defendants, through all of their acts described in this Complaint, including conspiring with the Nation of Islam and law enforcement officials, by terrorizing Plaintiff in public in Phoenix and in Tucson, and to murder Plaintiff multiple times, have intended to cause harmful and offensive contact with Plaintiff, and have in fact caused Plaintiff fearful apprehension of such immediate harmful and offensive contact, and Plaintiff has been severely damaged physically, mentally and emotionally as the direct result of Defendants' actions.

### COUNT SIX– ATTEMPTED MURDER (BATTERY) - AGAINST DAVID MISCAVIGE - THE CHURCH OF SCIENTOLOGY INTERNATIONAL - THE CHURCH OF SCIENTOLOGY OF ARIZONA - VIRGINIA LEASON AND DIANE KOEL

210. Paragraphs 1-209 are incorporated herein, as if fully set forth at length.

211. Defendants through all of their acts described in this Complaint, including attempting to murder Plaintiff in conspiracy with the Nation of Islam and law enforcement officials multiple times, including at St. Joseph's Hospital, intended to cause harm or offensive contact with Plaintiff, and caused such harmful and offensive contact with Plaintiff by trying to murder him on multiple occasions, and Plaintiff has been severely physically, mentally & emotionally damaged as the direct result of Defendants' actions, and his Bipolar Disorder exponentially aggravated.

## COUNT SEVEN - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS - AGAINST DAVID MISCAVIGE - THE CHURCH OF SCIENTOLOGY INTERNATIONAL - THE CHURCH OF SCIENTOLOGY OF ARIZONA - VIRGINIA LEASON AND DIANE KOEL

212. Paragraphs 1-211 are incorporated herein as if fully set forth at length.

213. Defendants' conduct in attempting to murder Plaintiff, in conspiracy with the Nation of Islam, and terrorizing Plaintiff with large groups of Scientology operatives in public places in Arizona, like grocery stores, and public streets, in the Fall of 2016, and harassing Plaintiff on his cell phone in Phoenix during the Fall of 2016 with bizarre messages left by Scientology operatives, and conspiring with law enforcement officials and Catholic

Hospitals and Sunni Muslim Executioners, and Hospital Emergency Room members to assassinate Plaintiff, was extreme and outrageous, and Defendants' conduct was intentional, and designed to cause Plaintiff extreme emotional distress, and Plaintiff has in fact, suffered severe emotional distress, and has been permanently damaged as the result of Defendants' actions.

## COUNT EIGHT – ASSAULT – AGAINST COMMUNITY BRIDGES, INC., FRANK SCARPATI, DEANN MILLER-HEYER, AND JOHN F. HOGEBOOM

214. Paragraphs 1-213 are incorporated herein as if fully set forth at length.

215. Defendants, through all of their acts, and the acts of their employees, for which they are responsible for, described in this Complaint, including conspiring with the Nation of Islam and law enforcement officials to murder Plaintiff on November 3rd and 4th, 2016, even though they operate a crisis services agency, have intended to cause harmful and offensive contact with Plaintiff, and have in fact caused Plaintiff fearful apprehension of such immediate harmful and offensive contact, and Plaintiff has been severely damaged physically, mentally and emotionally as the direct result of Defendants' actions.

## COUNT NINE – ATTEMPTED MURDER (BATTERY) – AGAINST COMMUNITY BRIDGES, INC., FRANK SCARPATI, DEANN MILLER-HEYER, AND JOHN F. HOGEBOOM

216. Paragraphs 1-215 are incorporated herein, as if fully set forth at length.

217. Defendants, through all of their acts, and the acts of their employees for which they are responsible, described in this Complaint, including attempting to murder Plaintiff in conspiracy with the Nation of Islam and law enforcement officials, at Banner Desert Medical Center, intended to cause harm or offensive contact with Plaintiff, and caused such harmful and offensive contact with Plaintiff by trying to murder him on November 3rd and 4th, 2016, and Plaintiff has been severely physically, mentally & emotionally damaged as the direct result of Defendants' actions, and his Bipolar Disorder exponentially aggravated.

## COUNT TEN– FALSE IMPRISONMENT – AGAINST COMMUNITY BRIDGES, INC., FRANK SCARPATI, DEANN MILLER-HEYER, AND JOHN F. HOGEBOOM

218. Paragraphs 1-217 are incorporated herein as if fully set forth at length.

219. Defendants acted to restrain Plaintiff to an area at Community Bridges, Inc. at 358 East Javelina in Tucson, on Thursday night, November 3, 2016,

within Defendants' control, and Defendants acted without lawful authority and without Plaintiff's consent, and Defendants' actions resulted in the direct restraint of Plaintiff's liberty and freedom of movement, either by actual force or fear of force, and Defendants' acts would have caused a reasonably prudent person in the same situation as Plaintiff to believe that he was restrained, and Plaintiff was both aware of, and extremely harmed by, the restraint, and severely damaged as a result, physically, mentally, and emotionally.

## COUNT ELEVEN – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – AGAINST COMMUNITY BRIDGES, INC., FRANK SCARPATI, DEANN MILLER-HEYER, AND JOHN F. HOGEBOOM

220. Paragraphs 1-219 are incorporated herein, as if fully set forth at length.

221. Defendants' conduct in attempting to murder Plaintiff, and conspiring with the Nation of Islam, and the acts of their employees for which they are responsible, including terrorizing and assaulting Plaintiff the night of Thursday, November, 2016, denying Plaintiff his cell phones to call his Mother, and attempting to murder in conspiracy with the Mesa, AZ Fire Department paramedics,  was extreme and outrageous, and Defendants' conduct was intentional, and designed to cause Plaintiff extreme emotional

distress, and Plaintiff has in fact, suffered severe emotional distress, and has been permanently damaged as the result of Defendants' actions.

## COUNT TWELVE – NEGLIGENCE – AGAINST COMMUNITY BRIDGES, INC., FRANK SCARPATI, DEANN MILLER-HEYER, AND JOHN F. HOGEBOOM

222.  Paragraphs 1-221 are incorporated herein as if fully set forth at length.

223. Defendants' actions, and the actions of their employees, by conspiring with the Nation of Islam and the Mesa Fire Department Paramedics to murder Plaintiff, and by terrorizing Plaintiff the night of November 3, 2016 at C.B.I. at Javelina, and denying Plaintiff the use of his cell phones to call his family, and falsely imprisoning him, and further injuring Plaintiff, Defendants had a duty and applicable standard of care recognized in the law for the operation of crisis intervention services, for which Defendants receive millions of dollars in public money, and Defendant came to Defendants the night of November 3, 2016 for help, and rather than helping Plaintiff, Defendants and their employees attempted to murder Plaintiff, thereby breaching their duty to Plaintiff, and the applicable standard of care, and as a direct and proximate result of that breach, Plaintiff was egregiously injured, and severely damaged, physically, mentally, and emotionally,

66

permanently, which amount of damages will be determined by the jury at trial.

## COUNT THIRTEEN– NEGLIGENCE PER SE – AGAINST COMMUNITY BRIDGES, INC., FRANK SCARPATI, DEANN MILLER-HEYER, AND JOHN F. HOGEBOOM

224. Paragraphs 1-223 are incorporated herein as if fully set forth at length.

225. Defendants, by their tortious acts, and breach of their duty to and failure to uphold the applicable standard of care for Plaintiff, have violated state and federal laws and regulations enacted for the health and safety of the public, applicable to the operation of crisis centers, and are therefore Negligent Per Se.

## COUNT FOURTEEN – 42 U.S.C. 1983 – AS AGAINST "TWO MESA FIRE AND MEDICAL DEPARTMENT PARAMEDIC DOE DEFENDANTS" – DEPRIVATION OF CIVIL RIGHTS WHILE ACTING UNDER COLOR OF STATE LAW – FREEDOM OF RELIGION, FREEDOM OF SPEECH (CONST. AMEND. 1); UNREASONABLE SEIZURE (CONST. AMEND 4)

226. Paragraphs 1-225 are incorporated herein as if fully set forth at length.

227. Defendants transported Plaintiff to Banner Desert Medical Center in the late evening, or early morning of November 3rd, and 4th, 2016, from Community Bridges, Inc. Crisis Center on Javelina, and while they did, in

conspiracy with the Nation of Islam, and upon information and belief, the Mesa Police Department, these Doe Defendants attempted to murder Plaintiff by injecting a medication into his arm, designed to explode Plaintiff's heart, and, upon information and belief, Plaintiff almost did die of a heart attack as the result of these Defendants' actions. Because the Nation of Islam wants to murder Plaintiff because of his use of the "N-Word", the actions of these Defendants deprived Plaintiff of his U.S. Constitutionally protected right of free speech under the 1st Amendment, and they acted under color of state law when they deprived Plaintiff of this right.

228. Because the Nation of Islam wants to murder Plaintiff because he is a blond haired, blue-eyed Caucasian Christian man, and the Nation of Islam are Black Radical Islamic Terrorists, Defendants, by attempting to murder Plaintiff for the Nation of Islam, deprived Plaintiff of his Constitutionally guaranteed right to freedom of religion under the 1st Amendment to the United States Constitution, and did so while acting under the color of state law, in their capacities of Mesa Fire Department Paramedics.

229. Defendants, by essentially taking Plaintiff captive as a prisoner, and then attempting to murder him, while acting under color of state law,

deprived Plaintiff of his U.S. Constitutionally protected right against unreasonable seizure, under the 4th Amendment to the U.S. Constitution.

230. Defendants actions have a chilling effect on the freedom of speech and freedom of religion, because, as public officials, Defendants have an additional responsibility to uphold the Bill of Rights, and not deprive Citizens of the United States of those rights.

## COUNT FIFTEEN – 42 U.S.C. 1983 – DEPRIVATION OF CIVIL RIGHTS - AGAINST THE CITY OF MESA AND THE MESA FIRE AND MEDICAL DEPARTMENT –

231. Paragraphs 1-230 are incorporated herein as if fully set forth at length.

232. If fire department paramedics, who, upon information and belief, take an oath to protect and safe human life, act in contravention of the oath, and attempt to murder a innocent white man who is in crisis, acting under color of state law, in conspiracy with a Radical Islamic Terrorist group, then, upon and belief, the responsible supervisory parties for those governmental officials must assume responsibility for the Constitutional deprivations.

233. The Mesa Fire and Medical Department Paramedics, acting under color of state law, by attempting to murder Plaintiff on behalf of the Nation of

Islam, deprived Plaintiff of his rights to freedom of speech and religion, and against unreasonable seizure. (CONST. AMEND 1 & 4)

234. These actions are the result of the City of Mesa and the Mesa Fire and Medical Departments fail to properly train its officials to uphold the Bill of Rights, and not, under any circumstances, conspire with the Nation of Islam to murder a white Christian man for Allah.

235. The City of Mesa and the Mesa Fire and Medical Department have a training program that is grossly inadequate, as it did not prevent two of its officials from attempting to murder an innocent white man, rather than fulfilling their tasks to aid that man in a health crisis; Mesa City Officials and Mesa Fire and Medical Department Officials must be indifferent to the Constitutional rights of the citizens that their officials, in this case, their paramedics, come in contact with, and the inadequacy of the training program that the City of Mesa has for their police and fire department officials, and in this case their paramedics, actually caused the Constitutional deprivations suffered by Plaintiff.

## COUNT SIXTEEN –NEGLIGENCE – BANNER HEALTH, INC., BANNER DESERT MEDICAL CENTER EMERGENCY DEPARTMENT- PETER S. FINE, M.D., INDIVIDUALLY, AND MARJORIE BESSEL, M.D., INDIVIDUALLY

236. Paragraphs 1-235 are incorporated here by reference, as if fully set forth at length.

237.   Defendants Banner Health, Inc., Banner Desert Medical Center Emergency Department, Peter S. Fine, and Marjorie Bessel, M.D., jointly and severally, had a legally cognizable duty and standard of care applicable to the operation of hospitals, which duty  and standard was owed Plaintiff when he was transported to Banner Desert Medical Center in Mesa, early the morning of Friday, November 4th, 2016.

238.   The conduct of the Emergency Department Staff members who attended Plaintiff breached that standard and failed in that duty by; a. Not rendering appropriate care to Plaintiff upon his arrival, even though Plaintiff was in cardiac distress; b. terrorizing Plaintiff by depriving him of his cell phones to call his family; c. By allowing as a nurse employee to call a Muslim security guard with two other guards who arrived at Plaintiff's bedside and who joked about killing Plaintiff through suffocating him with a plastic bag.

239.   Those employees breach of their duty was the direct and proximate cause of Plaintiff's injuries, namely extreme emotional distress, on top of the

emotional distress Plaintiff was already suffering, by virtue of the Mesa Fire Department and Medical Services paramedics trying to murder Plaintiff by administering a medication in the ambulance, designed to explode Plaintiff's heart.

240. The amount of damages suffered by Plaintiff as the result of the negligence of these Defendants will be determined by the jury.

## COUNT SEVENTEEN – ASSAULT – AS AGAINST LAUREL LEE PAVLIK, JAGDISH M. PATEL, AND HIMADA PROPERTIES, LLC

241. Paragraphs 1-240 are incorporated herein by reference, as if fully set forth at length.

242. Defendants, through all of their acts described in this Complaint, intended to cause harmful and offensive contact to Plaintiff, including allowing the Nation of Islam and the Tucson Police Department to attempt to murder Plaintiff, by allowing the Nation of Islam to place a bomb in Room #146 of the Ramada Limited Tucson West Motel, the night of May 3, 2017. Further, upon information and belief, Laurel Lee Pavlik instructed her front desk staff to put Plaintiff in Room 146 when he arrived that night, knowing full well that room #146 was a death sentence for Plaintiff. Upon information and belief, Jagdish M. Patel ratified the acts of Laurel Lee

Pavlik. Defendants therefore intended to cause harmful and offensive contact with Plaintiff, and did in fact caused Plaintiff fearful apprehension of such immediate harmful and ofensive contact, and Plaintiff has been severely damaged physically, mentally and emotionally as the direct result of Defendants' actions.

## COUNT EIGHTEEN – ATTEMPTED MURDER (BATTERY) – AS AGAINST LAUREL LEE PAVLIK, JAGDISH M. PATEL, AND HIMADA PROPERTIES, LLC

243. Paragraphs 1-242 are incorporated by reference, as if fully set forth.

244. Defendants, through all of their acts, and the acts of their employees for which they are responsible, described in this Complaint, including attempting to murder Plaintiff in conspiracy with the Nation of Islam and law enforcement officials, by allowing the Nation of Islam and the Tucson Police to plant a bomb in Room 146 of the Ramada Limited Tucson West, intended to cause harm or offensive contact with Plaintiff, and caused such harmful and offensive contact with Plaintiff by trying to murder him on November 3rd, 2016, and Plaintiff has been severely physically, mentally & emotionally damaged as the direct result of Defendants' actions, and his Bipolar Disorder exponentially aggravated.

73

## COUNT NINETEEN– INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – AS AGAINST LAUREL LEE PAVLIK, JAGDISH M. PATEL, AND HIMADA PROPERTIES, LLC

245. Paragraphs 1-244 are incorporated by reference as if fully set forth.

246. Defendants' conduct was extreme and outrageous, in allowing the Nation of Islam and the Tucson Police to attempt to blow Plaintiff up in Room #146 of the Ramada Limited Tucson West Motel, and Defendants' conduct was intentional, and designed to cause Plaintiff extreme emotional distress, and Plaintiff did and has, in fact, suffered severe emotional distress, and has been permanently damaged as the result of Defendants' actions.

## COUNT TWENTY – NEGLIGENCE – AS AGAINST JAGDISH M. PATEL, INDIVIDUALLY, HIMADA PROPERTIES, L.L.C., RAMADA WORLDWIDE, INC., WYNDHAM WORLWIDE, INC. STEPHEN P. HOLMES, INDIVIDUALLY, AND CARYL PORTER, INDIVIDUALLY

247. Paragraphs 1-248 are incorporated herein, as if fully set forth.

248. These named jointly and severally had a legally cognizable duty and standard of care applicable to the operation of motels, which duty and standard was owed Plaintiff when he was a guest at the Ramada Limited Tucson West on Wednesday night May 3, 2017.

249. Part of the reason Plaintiff stayed at the Ramada Limited Tucson West was because he believed he would safe, which what the Ramada brand promises.

250. Defendants all breached that duty and failed to adhere to that standard of care, by conspiring with the Nation of Islam and the Tucson Police Department and planting a bomb in Plaintiff's room before Plaintiff arrived, and then allowing the Nation of Islam to remove the bomb the next day when it failed to detonate, without notifying federal law enforcement authorities.

251. Defendant's breaches of their duty was the direct and proximate cause of Plaintiff's injuries, namely extreme emotional distress, and mental injuries, and Post Traumatic Stress Disorder/

252. The amount of damages suffered by Plaintiff as the result of the negligence of these Defendants will be determined at trial.

**COUNT TWENTY ONE – ASSAULT – AS AGAINST TWO HISPANIC TUCSON POLICE OFFICER "DOE" DEFENDANTS", THE CITY OF TUCSON, THE TUCSON CITY COUNCIL, THE TUCSON POLICE DEPARTMENT, TUCSON POLICE CHIEF CHRISTOPHER MAGNUS , IN HIS OFFICIAL AND PERSONAL CAPACITY, MAYOR JONATHAN ROTHSCHILD, TUCSON POLICE OFFICER "DOE" DEFENDANTS 1-9, TUCSON FIRE CHIEF JAMES CRITCHLEY, IN HIS OFFICIAL AND PERSONAL CAPACITY, TUCSON FIRE DEPARTMENT AND EMERGENCY**

**MEDICAL SERVICES, AND TUCSON FIRE DEPARTMENT PARAMEDIC "DOE" DEFENDANTS 1-9, AND ST. JOSEPH'S HOSPITAL DEFENDANTS NICK "DOE", JILLIAN "DOE", CHIBA "DOE, KULNECHT "DOE", MIKE "DOE, SHERMAN "DOE, AND THE OTHER UNNAMED ST. JOSEPH'S HOSPITAL "DOE" DEFENDANTS**

253. Paragraphs 1-252 are incorporated herein, as if fully set forth at length.

254. Defendants, through all of their acts described in this Complaint, including attempting to murder Plaintiff multiple times, first by allowing the Nation of Islam to plant a bomb in Plaintiff's room at the Ramada Limited Tucson West on May 3rd, 2017, in conspiracy with the Tucson Police Department, then attempting to murder Plaintiff that same afternoon at St. Joseph's Hospital by instructing a male nurse named "Nick" to administer a lethal dose of heart enlargement medicine into Plaintiff's arm at the right elbow, then kidnapping and attempting to murder Plaintiff at St. Joseph's Hospital the following day May 4th and the early morning of May 5th, 2017, in conspiracy with the Nation of Islam, St. Joseph's Hospital Emergency Room staff, and a Muslim Executioner of Middle Eastern Descent, and, upon information and belief, the Islamic Center of Tucson, are all acts intended to cause harmful and offensive contact with Plaintiff, and did in fact cause Plaintiff fearful apprehension of such immediate harmful and

offensive contact, and Plaintiff has been severely damaged physically, mentally and emotionally as the direct and proximate result of Defendants' actions. Damages for Plaintiff's severe injuries shall be determined at trial. The employer Defendants herein are responsible for the acts of their employees performed within the scope of their duties, by all Tucson Police and Tucson Fire Department individual Defendants. The injuries to Plaintiff actually occurred while the employee Defendants were working for their employers, Plaintiff's injuries were caused by acts that the employee Defendants would normally do, because there were three separate attempts over the course of three days by these employee Defendants to murder Defendant, establishing a pattern of conduct, and the City of Tucson, and the other employer Defendants benefited in certain ways by allowing their employees to do the bidding of the Nation of Islam, by attempting to murder Plaintiff.

**COUNT TWENTY TWO – ATTEMPTED MURDER (BATTERY) – AS AGAINST TWO HISPANIC TUCSON POLICE OFFICER "DOE" DEFENDANTS", THE CITY OF TUCSON, THE TUCSON CITY COUNCIL, THE TUCSON POLICE DEPARTMENT, TUCSON POLICE CHIEF CHRISTOPHER MAGNUS , IN HIS OFFICIAL AND PERSONAL CAPACITY, MAYOR JONATHAN ROTHSCHILD, TUCSON POLICE OFFICER "DOE" DEFENDANTS 1-9, TUCSON FIRE CHIEF JAMES CRITCHLEY, IN HIS OFFICIAL AND PERSONAL CAPACITY, TUCSON FIRE DEPARTMENT AND**

**EMERGENCY MEDICAL SERVICES, AND TUCSON FIRE DEPARTMENT PARAMEDIC "DOE" DEFENDANTS 1-9, AND ST. JOSEPH'S HOSPITAL DEFENDANTS NICK "DOE", JILLIAN "DOE", CHIBA "DOE, KULNECHT "DOE", MIKE "DOE, SHERMAN "DOE, AND THE OTHER UNNAMED ST. JOSEPH'S HOSPITAL "DOE" DEFENDANTS**

255. Paragraphs 1-254 are incorporated herein, as if fully set forth at length.

256. Defendants, through all of their acts, and the acts of their employees for which they are responsible, described in this Complaint, including attempting to murder Plaintiff in conspiracy with the Nation of Islam, by allowing the Nation of Islam and the Tucson Police to plant a bomb in Room 146 of the Ramada Limited Tucson West, intended to cause harm or offensive contact with Plaintiff, and caused such harmful and offensive contact with Plaintiff by attempting to murder him on November 3rd, 2016, and then again by the acts described in the preceding paragraphs, including an attempt on Plaintiff's life later in the afternoon on Wednesday, May 3rd, 2017, at St. Joseph's Hospital by the unlawful administration of heart enlargement medicine by a nurse named "Nick". The next day, on May 4th and 5th, there was a very virulent attempt on Plaintiff's life, again at St. Joseph's Hospital, which almost caused the death of Plaintiff. Plaintiff has

been severely physically, mentally & emotionally damaged as the direct result of Defendants' actions.

**COUNT TWENTY THREE – FALSE IMPRISONMENT – AS AGAINST TWO HISPANIC TUCSON POLICE OFFICER "DOE" DEFENDANTS", THE CITY OF TUCSON, THE TUCSON CITY COUNCIL, THE TUCSON POLICE DEPARTMENT, TUCSON POLICE CHIEF CHRISTOPHER MAGNUS , IN HIS OFFICIAL AND PERSONAL CAPACITY, MAYOR JONATHAN ROTHSCHILD, TUCSON POLICE OFFICER "DOE" DEFENDANTS 1-9, TUCSON FIRE CHIEF JAMES CRITCHLEY, IN HIS OFFICIAL AND PERSONAL CAPACITY, TUCSON FIRE DEPARTMENT AND EMERGENCY MEDICAL SERVICES, AND TUCSON FIRE DEPARTMENT PARAMEDIC "DOE" DEFENDANTS 1-9, AND ST. JOSEPH'S HOSPITAL DEFENDANTS NICK "DOE", JILLIAN "DOE", CHIBA "DOE, KULNECHT "DOE", MIKE "DOE, SHERMAN "DOE, AND THE OTHER UNNAMED ST. JOSEPH'S HOSPITAL "DOE" DEFENDANTS**

257. The preceding paragraphs 1-256 are incorporated herein as if more fully set forth at length.

258. Defendants acted to restrain Plaintiff to an area in the lobby of the Ramada Limited Tucson West, during the late morning of Wednesday, May 3rd, 2017, to allow the Nation of Islam to remove the bomb it had planted in Plaintiff's room. Defendants acted to further restrain Plaintiff at St. Joseph's Hospital on Wednesday, March 3rd, 2017, and then again at St. Joseph's

Hospital on the evening of May 4th, and the morning of May 5th, 2017. These areas were within Defendants' control, and Defendants acted without lawful authority and without Plaintiff's consent, and Defendants' actions resulted in the direct restraint of Plaintiff's liberty and freedom of movement, either by actual force or fear of force, and Defendants' acts would have caused a reasonably prudent person in the same situation as Plaintiff to believe that he was restrained, and Plaintiff was both aware of, and extremely harmed by, the restraints, and severely damaged as a result, physically, mentally, and emotionally, in an amount to be determined at trial.

**COUNT TWENTY FOUR – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – AS AGAINST TWO HISPANIC TUCSON POLICE OFFICER "DOE" DEFENDANTS", THE CITY OF TUCSON, THE TUCSON CITY COUNCIL, THE TUCSON POLICE DEPARTMENT, TUCSON POLICE CHIEF CHRISTOPHER MAGNUS , IN HIS OFFICIAL AND PERSONAL CAPACITY, MAYOR JONATHAN ROTHSCHILD, TUCSON POLICE OFFICER "DOE" DEFENDANTS 1-9, TUCSON FIRE CHIEF JAMES CRITCHLEY, IN HIS OFFICIAL AND PERSONAL CAPACITY, TUCSON FIRE DEPARTMENT AND EMERGENCY MEDICAL SERVICES, AND TUCSON FIRE DEPARTMENT PARAMEDIC "DOE" DEFENDANTS 1-9, AND ST. JOSEPH'S HOSPITAL DEFENDANTS NICK "DOE", JILLIAN "DOE", CHIBA "DOE, KULNECHT "DOE", MIKE "DOE, SHERMAN "DOE, AND THE OTHER UNNAMED ST. JOSEPH'S HOSPITAL "DOE" DEFENDANTS**

259. The preceding paragraphs 1-258 are incorporated herein as if fully set forth at length.

260. Defendants' conduct was extreme and outrageous, in conspiring with and allowing the Nation of Islam and the Tucson Police and the Ramada Limited Tucson West to attempt to blow Plaintiff up in Room #146 of the Ramada Limited Tucson West Motel, and then attempting to murder Plaintiff twice at St. Joseph's Hospital, and Defendants' conduct was intentional, and designed to cause Plaintiff extreme emotional distress, and Plaintiff did and has, in fact, suffered severe emotional distress, and has been permanently damaged as the result of Defendants' actions, in an amount to be determined at trial. Defendant employers are responsible for the acts of their employers as discussed in a previous paragraph.

**COUNT TWENTY FIVE – NEGLIGENCE- AS AGAINST TWO HISPANIC TUCSON POLICE OFFICER "DOE" DEFENDANTS", THE CITY OF TUCSON, THE TUCSON CITY COUNCIL, THE TUCSON POLICE DEPARTMENT, TUCSON POLICE CHIEF CHRISTOPHER MAGNUS , IN HIS OFFICIAL AND PERSONAL CAPACITY, MAYOR JONATHAN ROTHSCHILD, TUCSON POLICE OFFICER "DOE" DEFENDANTS 1-9, TUCSON FIRE CHIEF JAMES CRITCHLEY, IN HIS OFFICIAL AND PERSONAL CAPACITY, TUCSON FIRE DEPARTMENT AND EMERGENCY**

**MEDICAL SERVICES, AND TUCSON FIRE DEPARTMENT
PARAMEDIC "DOE" DEFENDANTS 1-9, AND ST. JOSEPH'S
HOSPITAL DEFENDANTS NICK "DOE", JILLIAN "DOE", CHIBA
"DOE, KULNECHT "DOE", MIKE "DOE, SHERMAN "DOE, AND
THE OTHER UNNAMED ST. JOSEPH'S HOSPITAL "DOE"
DEFENDANTS**

261. The preceding paragraphs 1-260 are incorporated herein as if fully set forth at length.

262. All named Defendants, jointly and severally, had legally cognizable duties and standards of care applicable to Plaintiff, which were to protect the rights and physical safety and integrity of Plaintiff's person at all times, when he was in the City of Tucson, or in a hospital within the City of Tucson.

263. All named Defendants breached those standards and failed in those duties by conspiring with a Black Radical Islamic Terror Organization, the Nation of Islam, to terrorize and murder Plaintiff.

264. All named Defendants failed in their duties to investigate Plaintiff's serious allegations of Radical Islamic Terrorism and attempted murder, and report the commission of serious felonies by City employees and officials, and hospital employees to federal law enforcement authorities, and Defendants have engaged in a coverup and obstruction of justice.

265. All named Defendants breached their duty and the applicable standards of care, and those breaches were the direct and proximate cause of Plaintiff's serious and severe injuries, namely extreme emotional distress, exacerbation of his Bipolar Affective Disorder, physical ailments, and a mistrust of all governmental and law enforcement officials, and hospital workers in the State of Arizona.

266. The amount of damages suffered by Plaintiff as the result of the negligence of the named Defendants will be determined by the jury.

**COUNT TWENTY SIX – 42 U.S.C. 1983 – DEPRIVATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW – INDIVIDUAL TUCSON POLICE DEPARTMENT "DOE" DEFENDANTS, AND INDIVIDUAL TUCSON FIRE DEPARTMENT EMERGENCY SERVICES "DOE" DEFENDANTS- AND ALL ST. JOSEPH HOSPITAL INDIVIDUAL DOE DEFENDANTS - FREEDOM OF SPEECH – FREEDOM OF RELIGION (CONST. AMEND. I) – UNREASONABLE SEIZURE (CONST. AMEND. IV) – DENIAL OF LIBERTY WITHOUT DUE PROCESS OF LAW (CONST. AMEND. XIV)**

267. The preceding paragraphs 1-266 are incorporated herein as if fully set forth.

268. All named Defendants, all acting under color of state law, and conspiring with a Black Radical Islamic Terror Organization, and with each other, deprived Plaintiff of his Constitutionally protected rights under the 1st

Amendment (Speech and Freedom of Religion), the 4th Amendment (unreasonable seizure), and the 14th Amendment (denial of liberty without due process of law).

269. Plaintiff has been damaged by these Constitutional deprivations in an amount to be determined at trial.

**COUNT TWENTY SEVEN – 42 U.S.C. 1983 – DEPRIVATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW – AS AGAINST THE CITY OF TUCSON, THE TUCSON CITY COUNCIL, JOINTLY AND SEVERALLY, THE TUCSON POLICE DEPARTMENT, TUCSON POLICE CHIEF CHRISTOPHER MAGNUS, IN HIS OFFICIAL AND PERSONAL CAPACITY, MAYOR JONATHAN ROTHSCHILD, TUCSON FIRE CHIEF JAMES CRITCHLEY, IN HIS OFFICIAL AND PERSONAL CAPACITY - FREEDOM OF SPEECH – FREEDOM OF RELIGION (CONST. AMEND. I) – UNREASONABLE SEIZURE (CONST. AMEND. IV) – DENIAL OF LIBERTY WITHOUT DUE PROCESS OF LAW (CONST. AMEND. XIV) – FAILURE TO TRAIN**

270. The preceding paragraphs 1-269 are incorporated by reference as if fully set forth at length.

271. The responsible supervisory parties over those governmental officials who conspired to murder Plaintiff are responsible for the Constitutional deprivations suffered by Plaintiff.

84

272. Individual Tucson Police Officers and Tucson Fire Department Paramedics, in conspiracy with the Nation of Islam and St. Joseph Hospital's employees, deprived Plaintiff of his rights to freedom of speech and religion, and against unreasonable seizure. and deprived him of his liberty without due process of law. By kidnapping and attempting to murder Plaintiff, and otherwise conspiring to harm Plaintiff, these Defendants deprived Plaintiff of his rights under the Constitution.

273. These actions are the result of the City of Tucson's, Jonathan Rothschild's, the Tucson City Council's, the Tucson Police Department's, the Tucson Fire Department's, Christopher Magnus' and James Critchley's abject failure to properly train their employee and subordinate officials to uphold the Bill of Rights, the laws of the United States and the State of Arizona, and to not, under any circumstances, conspire with the Nation of Islam to murder a white Christian man for Allah.

274. These supervisory Defendants have a training program that is grossly inadequate, as it did not prevent its officials from attempting to murder an innocent white man, rather than fulfilling their obligations to protect the Constitutional rights of the citizens that their officials, in this case, their police officers and paramedics, come in contact with, and the inadequacy of

the training program that the City of Tucson and other Defendants has for their police and fire department officials, actually caused the serious and life threatening Constitutional deprivations suffered by Plaintiff.

## COUNT TWENTY EIGHT – ASSAULT – AGAINST COMMUNITY INTERVENTION ASSOCIATES, INC., DUSTIN "DOE' CRISIS WORKER, AND FRED COGBURN

275.  The preceding paragraphs 1-274 are incorporated herein as if fully set forth at length.

276.   All of Defendants' acts described in this Complaint, including attempting to murder Plaintiff, were ntended to cause harmful and offensive contact with Plaintiff, and have in fact caused Plaintiff fearful apprehension of such immediate harmful and offensive contact, and Plaintiff has been severely damaged physically, mentally and emotionally as the direct result of Defendants' actions.

## COUNT TWENTY NINE – ATTEMPTED MURDER (BATTERY) – AGAINST COMMUNITY INTERVENTION ASSOCIATES, INC., DUSTIN "DOE' CRISIS WORKER, AND FRED COGBURN

277.  The preceding paragraphs 1-276 are incorporated herein as if fully set forth at length.

278. All of Defendants' acts described in this Complaint, including attempting to murder Plaintiff on Wednesday, May 3, 2017, in conspiracy with the Nation of Islam and the Tucson Police Department, intended to cause harm or offensive contact with Plaintiff, and caused such harmful and offensive contact with Plaintiff by trying to murder Plaintiff at St. Joseph's Hospital with medications injected into his body, designed to kill him, and, as the direct result of this attempted murder, Plaintiff has been severely physically, mentally & emotionally damaged, and his Bipolar Disorder exponentially aggravated.

## COUNT THIRTY– INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – AGAINST COMMUNITY INTERVENTION ASSOCIATES, INC., DUSTIN "DOE" CRISIS WORKER, AND FRED COGBURN

279. The preceding paragraphs 1-278 are incorporated herein, as if fully set forth at length.

280. Defendants' conduct was extreme and outrageous, in conspiring with the Nation of Islam and the Tucson Police to murder Plaintiff at St. Joseph's Hospital, and Defendants' conduct was intentional, and designed to cause Plaintiff extreme emotional distress, and Plaintiff did and has, in fact,

suffered severe emotional distress, and has been permanently damaged as the result of Defendants' actions.

## COUNT THIRTY ONE – NEGLIGENCE – AGAINST – SMSJ HOLDINGS LLC. CHN HOLDINGS LLC. TUCSON HOSPITAL HOLDINGS. INC. TENET HEALTHCARE CORPORATION. DIGNITY HEALTH. ASCENSION HEALTH. INC., RONALD A. RITTENMEYER. MARK A. BENZ. STEVEN PIKE. M.D., ADRIENNE P. YARNISH. M.D., CARA M. CHRIST. M.D. (IN HER PERSONAL CAPACITY). EMERGENCY MEDICINE ASSOCIATES. AND THE ROMAN CATHOLIC DIOCESE OF TUCSON

281. Paragraphs 1-280 are incorporated herein, as if fully set forth at length.

282. All Defendants have legal duties and applicable standards of care in their respective roles, as those roles relate to the operation of St. Joseph's Hospital in Tucson, AZ.

283. Plaintiff suffered attempted murder twice in the St. Joseph's Hospital Emergency Room, during the period May 3-5, 2017, in a conspiracy between Hospital employees, the Nation of Islam, and the Tucson Police and Fire Department Emergency Services.

284. Those events are tragedies that never should have occurred. All named Defendants have responsibility for what happened. When Plaintiff complained after the murder attempts, not one single Defendant did anything

to either investigate Plaintiff's concerns, or report the crimes to the F.B.I. Such is the dereliction of duty of Defendants, that Plaintiff alleges they acted, jointly and severally, with an "evil mind".

285. Defendants failed to conform to their legal duties required by law, and applicable standards of care, and thereby breached those duties and standards, and those breaches were the direct and proximate cause of the damages Plaintiff has suffered, including extreme emotional distress and Post Traumatic Stress Disorder. The amount of damages Plaintiff is entitled to will be determined at trial.

## COUNTY THIRTY TWO – NEGLIGENCE - AS AGAINST GENERAL GROWTH PROPERTIES, INC.

286. The preceding paragraphs 1-285 are incorporated herein as if fully set forth at length.

287. GGP had a duty to Plaintiff, to keep him from being kidnapped by the Tucson Police Department, and the Tucson Fire Department Emergency Services, on the night of Thursday, May 4, 2017. There was enough of a public disturbance in front of Applebee's Grill + Bar, such that Mall Security should have responded, and rescued Plaintiff.

288. GGP breached its duty to protect Plaintiff and, as the result, Plaintiff almost died. Local governmental officials should not feel they can violate the laws of the United States and Arizona at Park Place Mall. GGP had a duty to make sure local law enforcement officials knew that, and didn't attempt to murder (kidnap) Plaintiff at Park Place Mall.

289. GGP's breach of its legal duty to protect Plaintiff from kidnapping and attempted murder, by any entity or person is the direct and proximate cause of Plaintiff's injuries, which are substantial, including extreme emotional distress, Post Traumatic Stress Disorder, and injuries, yet unknown, to Defendant's vital organs. Damages will be determined at trial.

## COUNT THIRTY THREE – ATTEMPTED MURDER (BATTERY) – AS AGAINST THE ISLAMIC CENTER OF TUCSON, MIR REHMATULLAH, HOSSEIN HAMEED, ISMAIL K. ZAHLAN, LYNN C. HOURANI, TAHA HASAN, ABBA S. KHAN, MAHMMOD ALABAGI, AND ABDULLA ALABAGI

290. The preceding paragraphs 1-289 are incorporated herein as if fully set forth at length.

291. Upon information and belief, Defendants, in conspiracy with the Nation of Islam and the Tucson Police Department and Tucson Fire Department, and St. Joseph's Hospital, know the identity of the Muslim of Middle Eastern Descent Executioner, who was present at Plaintiff's bedside

the night of Thursday, May, 4th, 2017, at St. Joseph's Hospital, intending to murder Plaintiff for Allah, and may, upon information and belief, have supplied him for that purpose. Defendants' actions, jointly and severally, intended to cause harm or offensive contact with Plaintiff, and caused such harmful and offensive contact with Plaintiff, by, upon information and belief, supplying that Muslim Executioner of Middle Eastern descent to murder Plaintiff for Allah. As the direct result of this attempted murder (battery), Plaintiff has been severely physically, mentally & emotionally damaged, in an amount to be determined at trial.

## CIVIL CONSPIRACY

292. Paragraphs 1-291 are incorporated herein, as if fully set forth at length.

293. By committing all the tortious acts described in this Complaint, all Defendants conspired either before the acts were committed, or after the acts were committed, by attempting to murder Plaintiff, and/or by refusing to investigate Plaintiff's accusations of a conspiracy to murder Plaintiff, and the attempted murders of Plaintiff, and have thereby agreed to accomplish an unlawful purpose, or to accomplish a lawful object by an unlawful means, causing Plaintiff damages.

## PUNITIVE DAMAGES

288. Paragraphs 1-287 are incorporated herein, as if fully set forth at length.

289. Defendants tortious acts were of such an aggravated and outrageous nature, involving spite and malice, or a fraudulent or evil motive, or a conscious and deliberate disregard for the interests and life of Plaintiff, that Defendants' conduct was willful, and wanton. Defendants deliberately continued their actions, despite the inevitable or highly probable harm that would be caused Plaintiff.

## PIERCING THE CORPORATE VEILS

290. Paragraphs 1-289 are incorporated herein as if fully set forth at length.

291. Entities don't kill people, people kill people.

292. The events, tortious acts, and circumstances in this case militate in strong favor of disregarding the corporate forms and piercing the corporate veils where applicable, to hold individual officers and/or shareholders personally liable for the conduct or debts of the entities in this case. Not to do so will wreak a grave injustice.

293. Financial firms owning hospitals without sufficient oversight is an enormous mistake. This case is hard evidence of it.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays this Honorable District Court award him:

a.    Compensatory damages in an amount to be determined at trial,

b.    Punitive damages in an amount to be determined at trial, and

c.    A permanent injunction, to prevent irreparable harm to Plaintiff, against the Nation of Islam, and all other Defendants who conspired and acted to cause harm to Plaintiff, prohibiting them from attempting to surveil, intimidate, harass, harm or otherwise murder Plaintiff, anywhere in the United States of America.

Respectfully Submitted,

Jonathan Ambrose VanLoan
In Propria Persona
6110 E. 2nd Street
Tucson, AZ  85711
520.274.5636
9thcircuitplaintiff@gmail.com
April 30, 2018